# EXHIBIT F

# Collective Bargaining Agreement

Between

Atlas Air, Inc.

and

International Brotherhood of Teamsters
Airline Division

As representative of
The Flight Deck Crew Members
in the service of

Atlas Air, Inc.

Effective Date: September 10, 2021

Amendable Date: September 10, 2026

# TABLE OF CONTENTS



**Article 1: Recognition, Scope, Successorship, and Labor Protective Provisions** ............................... 3

**Article 2: Definitions** ............................................................................................................ 12

**Article 3: Compensation** ...................................................................................................... 16

**Article 4: Profit Sharing** ....................................................................................................... 26

**Article 5: Travel Expenses** ................................................................................................... 28

**Article 6: Gateway Travel** .................................................................................................... 35

**Article 7: Vacation** ............................................................................................................... 41

**Article 8: Deadheading** ........................................................................................................ 49

**Article 9: Miscellaneous Flying** ........................................................................................... 56

**Article 10: Management and Non-Flying Duty** ..................................................................... 57

**Article 11: Training** .............................................................................................................. 61

**Article 12: Hours of Service** ................................................................................................ 77

**Article 13: Leaves of Absence** ............................................................................................. 90

**Article 14: Sick Leave** .......................................................................................................... 103

**Article 15: Physical Standards, Medical Examinations, Drug and Alcohol Testing and Related Provisions** ......................................................................................................... 108

**Article 16: Workers' Compensation Benefits** ....................................................................... 120

**Article 17: Missing, Internment, Prisoner, or Hostage Benefits** ........................................... 121

**Article 18: Union Representation** ......................................................................................... 125

**Article 19: Discipline, Discharge and Probation** .................................................................. 127

**Article 20: Grievance Procedure** .......................................................................................... 133

**Article 21: System Board of Adjustment** .............................................................................. 138

**Article 22: Seniority** ............................................................................................................. 145

# TABLE OF CONTENTS



**Article 23: Furlough and Recall** ................................................................ **215**

**Article 24: Filling of Vacancies** ................................................................ **221**

**Article 25: Scheduling** ................................................................................ **230**

**Article 26: General** ..................................................................................... **267**

**Article 27: Insurance Benefits** .................................................................. **276**

**Article 28: Retirement** ............................................................................... **281**

**Article 29: Union Security and Check-Off** .............................................. **283**

**Article 30: Uniforms** .................................................................................. **286**

**Article 31: Reserve Crew Members** .......................................................... **289**

**Article 32: New Equipment** ....................................................................... **295**

**Article 33: Hostile Area, Infectious Disease Area, and DOT Exemption 7573 Operations** ......... **298**

**Article 34: Duration** ................................................................................... **302**

**Article 35: Letters of Agreement** .............................................................. **303**

# ARTICLE

Recognition, Scope, Successorship,
and Labor Protective Provisions

**1**

### A.    Recognition

1.  In accordance with the National Mediation Board's certification in Case No. R- 7174, issued on December 22, 2008, Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (a single Air Carrier collectively referred to as the "Company") recognizes the International Brotherhood of Teamsters, Airline Division as the collective bargaining representative of the flight deck Crew Members employed by the Company.

2.  **Purpose of Agreement.** In the mutual interest of the Pilots, the Union, and the Company, the purpose of this Agreement is to provide for orderly collective bargaining relations between the Company and the Union, a method for the prompt and equitable disposition of grievances, and a method for the establishment of pay, rules and working conditions for the Pilots. In making this Agreement, the Union, the Crew Members and the Company agree to cooperate for the advancement of the purpose of this Agreement.

3.  **Sole Agreement.** Unless expressly otherwise agreed by the parties, this Agreement shall supersede all existing or previously executed agreements by and between the Company and the Union or any other labor organization or individual Crew Member with respect to the rates of pay, rules, or working conditions specifically covered by the provisions of this Agreement, including appended Letters of Agreement. Any and all subsequent amendments or revisions to this Agreement and to any appended letters of agreement between the parties shall be reduced to writing, signed by their authorized representatives, and become a part of this Agreement.

4.  **Characterization and No Discrimination.** Unless expressly otherwise agreed by the parties, whenever the words "Pilot(s)," "employee(s)" or "Crew Member(s)" are used in this Agreement, they designate and refer only to such Crew Members as covered by this Agreement. It is further recognized that whenever in this Agreement Crew Members or jobs are referred to in either the masculine or feminine gender, it shall be understood to mean both male and female Crew Members. It is further understood that the Company and Union will each comply with all applicable laws prohibiting discrimination against any Crew Member who is now, or may become, subject to the terms of this Agreement including age, race, sex, sexual orientation, sexual nonconformity, color, religion, national origin, handicap or disability, or any other characteristic protected by applicable local, state or federal law.

5.  The Collective Bargaining Agreement and any formal Letters of Agreement between the Company and the Union may be collectively referred to as the "Agreement."

### B.    Scope

1.  Except as may be provided otherwise in this Article or elsewhere in this Agreement or Letter of Agreement between the parties, all present or future flying that is performed by or for the Company, including flying performed by a Related Entity (as defined below), and whether or not the crew members doing such flying are based outside the United States, shall be performed by Crew

# ARTICLE

Recognition, Scope, Successorship,
and Labor Protective Provisions

**1**

the merger transaction.  The Union shall file a single carrier application with the National Mediation Board as soon as practicable after (but in no event later than four months after) both of the following have occurred:  (i) the closing date of the transaction, and (ii) the Company informs the Union of the intent to operationally merge the carriers or integrate the carriers' crew member seniority lists.  The Union agrees that the Company may, but is not required to, combine the carriers' operating certificates into a Single Operating Certificate pursuant to regulatory approval prior to, during, or after the parties' negotiations for a merged collective bargaining agreement, and the Union will not contest the deployment of the two pre-merger pilot groups under such Single Operating Certificate at any time, including but not limited to before completing negotiations for a merged collective bargaining agreement; provided, that the Company's ability to deploy the pre-merger pilot groups under such Single Operating Certificate shall be subject to the Company's obligation to maintain separately, and not interchange, the pilots or aircraft between the operations of the carriers and to comply with the provisions of the pilots' pre-merger collective bargaining agreements in such operations until completion of the processes for an Integrated Seniority List and Joint Collective Bargaining Agreement covering the pilot groups.

3. For the purposes of this Article 1.F., "complete operational merger" shall mean the combination of all or substantially all of the assets of the two carriers.

4. Notwithstanding anything in this Article 1.F. to the contrary, in the absence of a complete operational merger as determined by the Company, neither the Company nor any successor shall be under any obligation to integrate the two work forces, and either may operate both workforces independently pursuant to their respective pre-existing collective bargaining agreements (if any).

## G.  Management Rights

1. Except as may be limited by the express provisions of this Agreement, the Company retains the sole and exclusive right to manage and operate its business, including, but not limited to, direct its Crew Member workforce; determine the appropriate number of Crew Members; hire, promote, and discharge Crew Members; establish and enforce rules of conduct; maintain discipline and efficiency; introduce new equipment; determine the location(s) of the work force, operations, and facilities; plan, direct and control operations; expand, limit or curtail operations when its deems advisable to do so; sell all or part of the business; sell or lease aircraft or facilities; determine when and where to operate scheduled or unscheduled flights; determine marketing methods and strategies; enter into code-sharing, affiliation or marketing arrangements with other air carriers; and invests (including equity investments) in other business entities, including other air carriers.

2. The Company's exercise of any retained right in a particular manner, or the non-exercise of such right in any particular manner, shall not operate as a waiver of the Company's rights

# ARTICLE

Recognition, Scope, Successorship,
and Labor Protective Provisions

**1**

hereunder, or preclude the Company from exercising its right(s) in a different manner in the future.

3.  The past practices, employment policies, interim agreements, or other understandings established prior to the effective date of this Agreement shall not create any precedent or contractual right(s) in favor of the Union or the Crew Members it represents, nor shall such create any precedent, contractual, or legal obligation(s) on the part of the Company to continue such practices, policies, agreements, or understandings.

4.  Notwithstanding the provisions of Articles 1.G.1., 1.G.2., and 1.G.3., above, the Company agrees to engage in constructive dialog with the Union regarding any issue that the Union believes may or has materially impact(ed) the terms and conditions affecting the Crew Members covered herein.

## H.  Expedited Adjustment Board Procedures

1.  Any grievance filed by the Company or Union alleging a violation of Section 1 shall bypass the initial steps of the grievance process and shall be submitted, heard, and resolved through binding arbitration on an expedited basis directly before the Atlas Crew Members' System Board of Adjustment sitting with a neutral arbitrator. The dispute shall be heard as soon as possible after submission to the System Board and decided no later than thirty (30) days after the close of the hearing, unless the parties agree otherwise in writing.

2.  The neutral arbitrator shall be selected by the parties by mutual agreement, or by an alternate strike method, if necessary, from a standing panel of seven (7) arbitrators, each of whom shall belong to the National Academy of Arbitrators and be experienced in disputes arising under the Air Carrier collective bargaining agreements. The panel will be designated before this Agreement becomes effective.

## I.  Information Production

The Company agrees to provide the Union, upon request, with documents and information reasonably necessary to determine compliance with Article 1. Proprietary, sensitive or confidential information shall be subject to a standard confidentiality agreement, if required by the Company.

## J.  No Alter Ego Carrier

The Company shall not create an "alter ego" to avoid the terms and conditions of the Agreement.

## K.  Railway Labor Act Extraterritoriality

The parties agree to apply this Agreement to flying anywhere in the world and the Company agrees not to raise a defense to any grievance or legal proceeding arising out of the interpretation or application of this Agreement based on the asserted absence of extraterritorial Railway Labor Act

# ARTICLE **15**
### Physical Standards, Medical Examinations, Drug and Alcohol Testing and Related Provisions

## A. PHYSICAL STANDARDS

1. The physical standards required of a Crew Member shall be the standards required by the Federal Aviation Administration (as outlined in 14 CFR Part 67 and as may be amended), including its waiver policy, for the medical certificate that the Company requires for the Position that the Crew Member holds.

2. Each Crew Member may select the Aviation Medical Examiner (AME) of his choice for meeting the requirements set forth in this Article. The Crew Member shall provide a copy of his Airman's Medical Certificate to the Company no later than the twentieth (20th) of the month in which his prior certificate is scheduled to expire unless the parties mutually agree to another date or time. The cost of such examinations shall be borne by the Crew Member.

3. If a Crew Member does not or cannot meet the standards for the medical certificate required by the Company for his Position, he must immediately notify the Chief Pilot and Crew Management. Thereafter, such a Crew Member, other than a probationary Crew Member, will be permitted to bid only vacancies in a Status that his seniority and medical certificate will permit him to hold until such time as he regains the class of medical certificate required for his former Position.

## B. FITNESS FOR DUTY

1. The Company may require a Crew Member to submit to a fitness for duty examination conducted by a Company designated AME in accordance with the "Guide for Aviation Medical Examiners," under the following circumstances.

   a. Upon a finding by a Crew Member's AME that the Crew Member does not meet the standards for the class of medical certificate required for the Position that the Crew Member holds to the extent necessary to determine the accuracy of the original AME's finding; or

   b. When the Company has reliable information that raises a reasonable suspicion regarding a Crew Member's ability to safely perform all of his duties, or that the Crew Member's present medical condition has changed the status of his medical certificate. In such a case, the Company shall provide to the Crew Member the information it is relying on to require the fitness for duty examination; provided, it shall not be required to provide to the Crew Member any information regarding the source of that information; or

   c. When the Crew Member has asserted to the Company that he is either physically or mentally unable to safely perform the duties of his job or otherwise has a medical condition that renders him unable to lawfully exercise the privileges of his Airman's

# ARTICLE 15

### Physical Standards, Medical Examinations, Drug and Alcohol Testing and Related Provisions

Medical Certificate.

2. Any medical examination required under this Article 15.B. shall be performed by an AME with the appropriate specialty needed to evaluate the Crew Member's physical or mental condition, or medical specialists as referred by the AME. The cost of the examination(s) shall be borne by the Company.

   a. The location of all such examinations shall be within seventy-five (75) miles of the Crew Member's residence unless a different mutually agreeable location is selected. If the examination is not to be conducted at a location within seventy-five (75) miles of the Crew Member's residence, the Company will provide the Crew Member transportation and any reasonably required hotel accommodations, together with per diem. However, a Crew Member who fails to cooperate in the scheduling of any required examination under this Article 15.B., or cancels a scheduled examination without the agreement of the Company, will be removed from pay status and, as may be applicable, shall be ineligible for the further use of any accrued sick leave.

   b. Within ten (10) days of the Company's receipt of the Company designated AME's report, a copy of the report shall be sent to the Crew Member via overnight mail, by electronic means (if acceptable to both the Company and the Crew Member) or by hand delivery.

3. A Crew Member required to undergo an examination by a Company designated AME pursuant to Article 15.B.1.b or c, above, shall be withheld from service with pay until the Company designated AME has submitted his report to the Company.

   a. If as a result of such medical examination the Company's designated AME determines that the Crew Member is not able to hold and/or exercise the medical certificate required by the Company for the Position that the Crew Member holds, then the Crew Member shall be removed from pay status; provided, however, that he shall be entitled to use any accrued sick leave pay and accrued vacation after sick leave pay has been exhausted, as provided for in Article 7 and Article 14 of this Agreement, and may invoke the provisions of Article 15.C., below.

   b. If as a result of such medical examination the Company's designated AME determines that the Crew Member is able to hold and exercise the medical certificate required by the Company for the Position that the Crew Member holds then the Crew Member shall be returned to duty.

4. A Crew Member required to undergo an examination by a Company designated AME pursuant to Article 15.B.1.a, above, shall be withheld from service without pay, provided, however, that he shall be entitled to use any accrued sick leave pay and accrued vacation after sick leave pay has been exhausted, as provided for in Articles 7 and 14 of this Agreement,

# ARTICLE **15**

Physical Standards, Medical Examinations,
Drug and Alcohol Testing and Related Provisions

until the Company designated AME has submitted his report to the Company.

a. If as a result of such medical examination the Company's designated AME determines that the Crew Member is able to hold and exercise the medical certificate required by the Company for the Position that the Crew Member holds, then the Crew Member shall no longer be entitled to use any accrued sick leave or accrued vacation and shall be returned to duty with pay; provided, however, that the Crew Member shall be entitled to invoke the provisions of Article 15.C., below.

b. If, as a result of such medical examination the Company's designated AME determines that the Crew Member is not able to hold or exercise the medical certificate by the Company for the Position that the Crew Member holds, then the Crew Member shall be entitled to use any accrued sick leave and accrued vacation after sick leave has been exhausted, as provided for in Articles 7 and 14 of the Agreement until the earlier of:

   i.   His accrued sick leave and/or accrued vacation have been exhausted;

   ii.  He is able to hold and exercise the medical certificate required for his Position;

   iii. He accepts another position with the Company.

## C. MEDICAL DISPUTE RESOLUTION PROCEDURES

In the case of a dispute arising from Article 15.B.3.a. or 15.B.4.a., above, between the Crew Member's designated AME and the Company's designated AME regarding the Crew Member's mental or physical fitness for duty, the Crew Member may invoke the following procedures.

1. The Crew Member must within seven (7) days after receipt of the findings of the Company's designated AME submit to the Chief Pilot a written request that the Company's designated AME and the Crew Member's designated AME select a third, impartial AME to resolve the dispute. Failure to request the selection of a third, impartial AME within the seven (7) day time limit provided shall render the findings of the Company's designated AME final and binding.

2. Following timely receipt of the Crew Member's request, the Company's designated AME will be asked to contact the Crew Member's designated AME for the purpose of selecting a third, impartial AME. If for any reason the Crew Member's designated AME declines to participate in this process, the Crew Member may select another AME to participate in the selection of the third, impartial AME on the Crew Member's behalf.

3. Within three (3) days of the appointment of the third, impartial AME, both the Company's and the Crew Member's designated AMEs will submit their findings, together with the

110

# ARTICLE **15**

Physical Standards, Medical Examinations,
Drug and Alcohol Testing and Related Provisions

findings of any other medical specialists involved, to the third, impartial AME.

4. All written communications by either the Company's or Crew Member's designated AME made to the third, impartial AME will be copied to the other party's designated AME. Further, no verbal or written communication regarding the merits of the Company's position or Crew Member's position in the dispute shall be made to the third, impartial AME by either the Company or the Union.

5. After receipt of the medical records referenced above, the third, impartial AME will, if he deems it necessary, examine the Crew Member and, if necessary refer the Crew Member to any medical specialist required in order for the third, impartial AME to make a determination regarding the Crew Member's ability to hold or exercise the medical certificate required by the Company for the Position that the Crew Member holds.

6. Within seven (7) days following his review of the records provided and any examination(s) of the Crew Member deemed necessary by the third, impartial AME, he shall render a final and binding determination regarding the dispute. The Crew Member shall be provided with a copy of the decision within ten (10) days.

7. If the Crew Member has been withheld from service involuntarily by the Company and is found by the third, impartial AME to be able to hold and exercise the medical certificate required by the Company for the Position that the Crew Member holds, then he will be pay protected by the Company for the period that he was withheld from service and his sick leave and accrued vacation account will be restored.

8. If the Crew Member has been withheld from service involuntarily by the Company and is found by the third, impartial AME to be unable to hold or exercise the medical certificate required by the Company for the Position that the Crew Member holds then his sick leave accrual will be reduced to the extent that he was receiving pay.

9. If the Crew Member has withheld himself from service and is found by the third, impartial AME to be able to hold and exercise the medical certificate required by the Company for the Position that the Crew Member holds, then he will be returned to duty and required to repay the Company for any sick leave and accrued vacation he received while the medical dispute was pending.

10. If the Crew Member has withheld himself from service and is found by the third, impartial AME to be unable to hold or exercise the medical certificate required for the Position that the Crew Member holds, then he will be paid his accrued sick leave and accrued vacation on a retroactive basis to the extent he could have utilized such pursuant to Article 7 and 14 but for the dispute regarding his fitness for duty and he will also be entitled thereafter to use his remaining accrued sick leave and accrued vacation if he so elects, as provided for in Article

# ARTICLE 15
### Physical Standards, Medical Examinations, Drug and Alcohol Testing and Related Provisions

7 and 14 of this Agreement.

11. The Company shall be responsible for the costs and, if the location of the examination is more than seventy-five (75) miles from the Crew Member's residence, Crew Member expenses associated with examination by its designated AME. The Crew Member shall be responsible for the costs and expenses associated with examination by his designated AME that are not covered by the Company's group insurance plan. Any costs and expenses incurred by the Crew Member in connection with examinations by the third, impartial AME not covered by the Company's group insurance plan shall be shared equally by the Company and the Crew Member.

12. Medical records and other information obtained as a result of a Company required medical examination or subsequent examinations pursuant to this Article 15.C shall be subject to safeguards as to their confidentiality in accordance with applicable law.

13. Any unjustifiable delays in the completion of these procedures that are the result of the action or inaction of the Crew Member shall render the Crew Member ineligible for continued pay status or the use of any accrued sick leave, as applicable.

14. Forms to be utilized for the engagement of the third, impartial AME and required release of medical information are included hereto as Appendices 15-A, 15-B, 15-C, 15-D and 15.E.

15. All correspondence and other written communications the Company is required to send to the Crew Member shall be sent to the Crew Member's designated address via certified mail, return receipt requested or by a commercially recognized courier service so as to ensure delivery and confirmation of receipt. The Company and Union may mutually agree to substitute electronic mail delivery on a case-by-case basis or in all cases.

## D. DRUG AND ALCOHOL TESTING AND RELATED PROVISIONS

1. A Crew Member shall be subject to drug and alcohol testing as required by applicable Federal Aviation Regulations (FARs) and by Company policy in effect as of the effective date of this Agreement, which may be modified from time to time as required by such regulations and other applicable law. No other changes to the policy applicable to Crew Members shall be made without the consent of the Union.

2. At the request of either party, representatives of the Union and representatives of the Company will meet to discuss the Company's administration of its drug and alcohol testing programs. The Company agrees to provide the Union with notice and an opportunity to consult prior to implementing any material changes to such program consistent with Article 15.D.1., above.

ARTICLE **19**
Discipline, Discharge and Probation

## A. JUST CAUSE, DISCIPLINE, DISCHARGE AND PROBATION

1. A Crew Member who has successfully completed his probationary period as defined in Article 19.A.2. shall not be disciplined or discharged except for just cause.

2. The duration of a Crew Member's probationary period shall be a total of twelve (12) months of Active Service beginning with the date on which the Crew Member first attended a session of successfully completed, new-hire training as a Crew Member.

## B. PROCEDURE FOR DISCIPLINE AND DISCHARGE OF CREW MEMBERS

A Crew Member shall not be disciplined or discharged without previously having been issued a Notice of Hearing Letter and afforded the opportunity to attend a hearing before his Chief Pilot, or his designees; provided, the Crew Member is reasonably available for the hearing or has not made himself unavailable for the hearing. If a Crewmember is unable to attend a scheduled hearing due to extenuating circumstances (e.g., sudden illness, family emergency, hospitalization), the Union and the Company will mutually agree to an alternate hearing date.

1. Notice of Hearing Letter

   a. The Company shall issue to the Crew Member a Notice of Hearing Letter before conducting any discipline or discharge hearing. Such Notice of Hearing Letter shall inform the Crew Member of the time and place of the hearing and the matter to be discussed, including the specific acts of misconduct or omission alleged and, as applicable, the Company rules, regulations, or policies alleged to have been violated. The Notice of Hearing Letter must also specifically reference that discipline or discharge may be assessed and that the Crew Member is entitled to the presence of a Union representative.

   b. The Notice of Hearing Letter must be issued within forty-five (45) days from the date the Company first had or should have had sufficient knowledge (i) of the events on which the discipline or discharge may be based, and (ii) that those events may constitute just cause for the discipline or discharge of the Crew Member involved. However, should the Company's investigation of the matter be ongoing it may, upon written notice to the Crew Member and the Union, extend this forty-five (45) day period by an additional forty-five (45) days. As part of its notice of extension of the time for issuing the Notice of Hearing Letter, the Company shall also provide to the Crew Member a statement identifying the acts of alleged misconduct or omission currently under investigation; provided, however, that if the events upon which discipline may be based involve actions by a Crew Member that are part of an ongoing criminal investigation or the subject of a filed criminal complaint or similar pleading these time limits for the issuance of a Notice of Hearing Letter shall not apply. Nothing in this paragraph shall be construed to limit the Company's

127

## ARTICLE 19
Discipline, Discharge and Probation

authority to impose progressive discipline or discharge on the basis of prior events.

   c. At the time the Company issues a Notice of Hearing Letter to a Crew Member it shall at the same time issue a copy of the letter to the Union.

2. The Hearing

   a. The hearing shall be scheduled to begin no earlier than ten (10) days and no later than fifteen (15) days from the time of the Crew Member's receipt of the Notice of Hearing Letter; provided, that in the case of a Crew Member suspended without pay as provided below, the hearing shall commence no later than ten (10) days after the first day of the Crew Member's suspension from service in accordance with Article 19.B.3.b. unless the Crew Member is unavailable. If the hearing does not timely commence as required, then the suspended Crew Member shall be returned to pay status; provided, that he shall remain subject to disciplinary action for the offense in question.

   b. To the extent reasonably possible and to the extent that doing so shall not affect the Crew Member's legality for duty or otherwise disrupt the operation, at the request of the Crew Member the hearing will be scheduled to occur on a day that the Crew Member, if not held out of service, is otherwise scheduled to be at his Base. The hearing shall not be scheduled on a Crew Member's Day-Off unless agreed to by the Crew Member.

   c. If the Crew Member for whom a hearing is to be held cannot be contacted after reasonable efforts have been made or he is unavailable for the hearing, then the Company shall meet with the Union to discuss the matter before assessing any discipline to the Crew Member or discharging him from the Company.

   d. A Crew Member has the right to Union representation at the hearing. If a Crew Member declines Union representation at the hearing, the Union has the right to attend such hearing and attend any additional hearings pursuant to this Article 19. If a Union representative is not reasonably available to attend the hearing after being released by the Company, a hearing pursuant to this Article 19.B.2 shall be telephonic unless the parties mutually agree to reschedule the hearing.

   e. By mutual agreement of the parties, a hearing pursuant to this Article 19.B.2 may be telephonic. Company officials other than the official conducting the hearing may also participate.

   f. If the Company agrees, a Crew Member may waive his entitlement to the hearing provided for in this Article. If the Crew Member elects to waive the hearing, the Company shall promptly inform the Union of the Crew Member's decision. If, prior to the original hearing date, the Crew Member informs the Company that he has reconsidered his election to waive the hearing, he shall be entitled to proceed with a hearing. In that case, the hearing will be scheduled to be held no later than five (5) business days of the original hearing

# ARTICLE 19
### Discipline, Discharge and Probation

date, unless the parties mutually agree otherwise, and the provisions of Article 19.B.2.a. shall be deemed waived by the Crew Member and the Union.

3. Crew Member's Status During an Investigation and Pending the Results of a Hearing:

   a. A Crew Member may be held out of service during an investigation that may lead to the assessment of discipline or discharge. Except as provided in Article 19.B.3.b, below, the Crew Member's pay shall be what the Crew Member would have earned under Article 3 of the Agreement, based on his scheduled trip(s), if applicable.

   b. A Crew Member may be held out of service without pay during an investigation that may lead to the assessment of discipline or discharge only for acts of violence, intentional or other malicious destruction of Company property, suspected violation of the Company's drug and alcohol policy, theft, gross insubordination, or other gross misconduct.

   c. A Crew Member held out of service pending an investigation that may lead to discipline or discharge shall continue to participate in the normal Bid Line procedure for subsequent Bid Periods as if he were not subject to an investigatory suspension. Any compensation that may be later determined to be due him shall be based on the presumed award of a Bid Line in accordance with normal procedures.

4. Results of the Hearing

   a. The Company shall issue its decision within fourteen (14) days following the close of the hearing, except in the case of a Crew Member that has been held out of service without pay in which case the decision shall be rendered within seven (7) days following the close of the hearing. If the Company fails to issue its decision within the specified time frame, the Crew Member shall be deemed exonerated.

   b. Any decision by the Company to discipline or discharge a Crew Member shall be in writing, with copies to the Union's designated representative.

   c. If a Crew Member has been withheld from service and/or notified that a hearing is to be held regarding any action or inaction on his part and the Crew Member is subsequently completely cleared of all of the charge(s) against him the following shall apply:

      i. To the extent not prohibited by law or applicable regulations, all Company records regarding the Crew Member, including the Crew Member's personnel and training files, shall be purged of all references to the charge(s).

      ii. The Crew Member shall receive back pay based on what the Crew Member would have earned under Article 3, based on his scheduled trip(s), if applicable, including his regular line flying, any open time trips he was awarded, and any reserve he was

# ARTICLE 19
### Discipline, Discharge and Probation

scheduled for.

    iii.  For each Day the Crew Member attended the hearing pursuant to Article 19.B.2.b. in person, on a scheduled Day-Off, the Crew Member shall receive the pay applicable to Work and Administrative Duty on a scheduled Day-Off. If the Crew Member attended the hearing telephonically on a scheduled Day-Off, the Crew Member shall receive one hour of pay.

    iv.  Seniority and Longevity shall be restored and the Crew Member shall otherwise be made whole.

  d.  If a Crew Member has been withheld from service and is subsequently assessed discipline intended to result in a monetary penalty less than the pay loss suffered in connection with the hearing process, the Crew Member shall be restored for the pay loss incurred that exceeds the intended monetary value, if any, of the discipline assessed. To the extent permitted by law or applicable regulations, all Company records including the Crew Member's personnel and training files, shall be purged of all references to the original charge(s) and pay loss incurred that exceeds the intended monetary value, if any, of the final discipline imposed.

## C.  RIGHT TO APPEAL

A Crew Member or the Union may appeal any adverse action taken under this Article 19, in accordance with the procedures set forth in Article 20. The appeal rights set forth in this Article 19.C. do not apply to Crew Members who have not completed the probationary period.

## D.  GENERAL

1.  The number of witnesses or representatives that shall be released from duty at the request of the Union to appear at a hearing under this Article 19 shall not unduly interfere with the operations of the Company. A Crew Member or party's right to call a witness shall be satisfied where the witness is provided an opportunity to participate in-person or by telephone in the hearing. As necessary, additional meeting dates shall be scheduled. A hearing under this Article 19 shall be concluded once all of the requested witnesses have been provided a reasonable opportunity to be heard in person or by telephone.

2.  The Union shall be responsible for the compensation, travel, and other expenses of their respective witnesses and Union representatives for hearings and any other meetings held under this Article 19 pursuant to flight pay loss procedures. To the extent permitted by law and as otherwise authorized by Company policy, the Company shall provide witnesses and Union representatives who are employees of the Company no cost, round trip, space-available transportation on Company aircraft to attend a hearing or other meeting held under this Article.

# ARTICLE 19
### Discipline, Discharge and Probation

3. The Company shall furnish at no-cost to the Crew Member, round trip (from the Crew Member's residence to the location of the hearing) commercial transportation for a Crew Member who is the subject of a hearing pursuant to this Article 19 in the event transportation over the lines of the Company is not available. In addition, the Company shall pay per diem and the cost of reasonable lodging expenses associated with the hearing.

4. In the event a witness who is a Crew Member is called by the Company and is released from duty for the purpose of presenting evidence at the hearing, in person or telephonically, the witness shall receive the pay the Crew Member would have earned under Article 3, based on his scheduled trip(s), if applicable, including his regular line flying, any open time trips he was awarded, and any reserve for which he was scheduled, for each Day he appears as a witness. In addition, when applicable, the Company shall pay per diem and the cost of reasonable lodging expenses associated with the hearing.

5. The time limits contained in this Article may be extended by written or oral agreement between the parties. As soon as practicable oral agreements to extend a time limit shall be confirmed in writing by the party who requested the extension. In the event a time limit contained in this Article 19, or any mutually agreed extension thereof, expires on a weekend or Company holiday, the time limit shall be extended to the next business day.

6. All notices, decisions, correspondence and other written communications the Company is required to send to the Crew Member and Union shall be sent to the Crew Member's designated address via electronic mail delivery, with a copy to the Union's designated representative.

7. Hearings under this Article shall be held at mutually agreeable times and locations. If the Company and the Union are unable to agree on a time and/or location, hearings shall be held at the general offices of the Company at a time directed by the Company after consultation with the Union regarding its availability.

8. A stenographic or other recording of the hearings or any other meeting provided for in this Article 19 shall not be made unless the parties mutually agree to do so, in which case the costs of such shall be borne equally between the parties.

9. The issuance of advisory letters to all Crew Members, or a class of Crew Members, intended only to communicate policy, procedures or Work rules that if violated could lead to discipline, do not constitute the assessment of discipline and are not subject to the provisions of this Article 19.

10. Individual counseling sessions and the documentation of such counseling sessions do not constitute the assessment of discipline and are not subject to the provisions of this Article. Documentation of a counseling session shall be treated as follows:

# ARTICLE 19
Discipline, Discharge and Probation

a. Documentation of a counseling session shall include a specific notation that the counseling did not constitute the assessment of discipline.

b. Documentation of a counseling session shall not be placed in the Crew Member's personnel file and/or training file, but may be otherwise retained by the Company and considered as part of the Crewmember's record. Documentation of a counseling session shall in no event serve as the basis for disciplinary action after a period of twenty-four (24) months during which the Crew Member receives no further documentation of counseling. However, documentation of a counseling session may be considered in assessing disciplinary action where such counseling was related to the matter giving rise to the disciplinary action and was issued within twenty-four (24) months of the disciplinary action.

c. Documentation of a counseling session shall not be divulged, communicated, or distributed outside of the Company without the written consent of the Crew Member, except as may be required by any governmental agency or authority, as required by the Pilots' Record Improvement Act of 1996, or as may be otherwise required by law.

11. Records of disciplinary action shall be placed in the Crew Member's personnel file and may be used for purposes of assessing progressive discipline until a period of thirty- six(36) months has passed during which the Crew Member receives no further disciplinary action upon the expiration of such thirty-six (36) month period, such records shall no longer be considered in assessing progressive discipline but shall remain in the Crew Member's personnel file and may be used for other purposes (e.g., Crew Member knowledge of policy in question and potential mitigation of disciplinary action).

12. The Company shall provide the Union with copies of any documents, including witness statements, that the Company intends to present or rely on at the hearing. The Company will provide the Union with such documents no later than two (2) business days prior to the hearing, unless the Company obtains the documents after that deadline, in which case the Company shall provide copies to the Union prior to the hearing. If the Company intends to present or rely on any recordings at the hearing, it shall allow the Union an opportunity to listen to the recordings no later than two (2) business days prior to the hearing, unless the Company obtains the recordings after that deadline, in which case the Company shall provide the Union an opportunity to listen to the recordings prior to the hearing-. If the Union needs additional time to prepare for a hearing because of information contained in recordings disclosed less than two (2) business days prior to the hearing, the Union may request that the hearing be postponed for no more than five (5) business days, and such request will not be unreasonably denied by the Company.



# ARTICLE 22
## Seniority

### A. GENERAL

1. Except as may otherwise be provided in this Agreement, seniority will govern with respect to upgrade and downgrade, filling of vacancies, displacements, reduction in force (furlough), recall from furlough, Base and aircraft assignments due to expansion or reduction in aircraft and Base staffing, monthly schedules, vacation bidding and when otherwise required by the Agreement.

2. There shall be one seniority list, the Atlas Air Pilots' Master Seniority List."

   a. Seniority as a Crew Member shall be based on the individual's length of service as a Crew Member, beginning with the date the individual commenced training with the Company as a Crew Member, and his relative position in that Crew Member training class.

   b. For the Atlas Air Pilots' Master Seniority List, if an individual is currently employed by the Company, he shall be placed on the list first. When two or more individuals currently employed by the Company begin training on the same date, placement on the list will be determined using the last four digits of their Social Security numbers, with the individual having the lower number placed on the list first. If two or more such individuals have the same four Social Security numbers, then the last six Social Security numbers shall be used to determine placement on the list, with the individual having the lower number placed on the list first. After individuals currently employed by the Company are placed on the list in accordance with the procedure above, the Social Security number rules above shall be used to determine the placement of all other individuals who begin training on the same date.

3. Except as may be otherwise provided in this Agreement, seniority as a Crew Member will continue to accrue during the individual's uninterrupted period of employment with the Company.

4. The promotion of a junior Crew Member over a more senior Crew Member as may be allowed under this Agreement shall not affect either Crew Member's relative position on the Atlas Air Pilots' Master Seniority List.

### B. SENIORITY LIST

1. The Company shall maintain the Atlas Air Pilots' Master Seniority List, which will include all Crew Members employed by the Company as of the date the list is published. The Atlas Air Pilots' Master Seniority List as of the date of the signing of this Agreement is attached hereto as Appendix 22-A.

2. The official Atlas Air Pilots' Master Seniority List will be published and posted by the Company on March 1st and September 1st of each year and at the time a Bid Award is



ARTICLE **22**
Seniority

published. The list will contain the names of all Crew Members holding seniority on the list and, at a minimum, the following information for each Crew Member shown, current as of the February 15th for the March 1st posted lists and August 15th for the September 1st posted list and as of the date used for a Bid Award:

a.  Date of hire as a Crew Member and relative seniority number.

b.  Status.

c.  Position.

d.  Duty status (i.e., active, leave of absence, furlough, management).

## C. PROTESTS REGARDING SENIORITY

1.  A Crew Member shall have a period of forty-five (45) days after the posting of the Atlas Air Pilots' Master Seniority List to protest to the Company his relative seniority position or other incorrect posting that affects his seniority on the list; *provided*, however, that a Crew Member on vacation, leave of absence, or furlough shall be permitted fourteen (14) days after return to duty to submit a protest as allowed herein. A Crew Member failing to file a written protest within the time limits provided herein shall be bound by the list as posted and shall have no further recourse.

2.  A Crew Member protesting his position on the Atlas Air Pilots' Master Seniority List shall submit the protest in writing to the Company's Vice President of Flight Operations or his designee, with a copy to the Union. Only protests relating to errors or changes occurring after the last required posting of the official Atlas Air Pilots' Master Seniority List shall be subject to this or any other protest procedure, including the grievance procedure set forth in Article 20 of this Agreement.

3.  The Company will present all properly submitted seniority protests to the Union for its review and position regarding how the protest should be resolved.

    a.  If the Company agrees with the resolution of the seniority protest proposed by the Union then the Atlas Air Pilots' Master Seniority List will be amended accordingly and the protest resolution will become final and binding on all parties and for all purposes.

    b.  If the Company does not agree with the resolution of the seniority protest proposed by the Union then the Union may submit the matter directly to the Atlas Air Inc. System Board of Adjustment ("Board") provided for in Article 21 of this Agreement. Should the protest be so submitted, the Board shall be asked to hear the matter as expeditiously as possible and its decision in the matter will be final and binding on all parties and for all purposes.



ARTICLE **22**
Seniority

### D.  LOSS OF SENIORITY

A Crew Member will forfeit all seniority rights and his name will be removed from the Atlas Air Pilots' Master Seniority List as may be specifically provided elsewhere in this Agreement when he:

1.  Is discharged and the discharge is upheld or unchallenged;

2.  Retires or dies;

3.  Resigns his employment with the Company;

4.  Does not return to work upon the expiration of a leave of absence;

5.  Has been on continuous leave for a period in excess of that provided for the leave he was granted in Article 13; or

6.  Has been on furlough for a period in excess of that provided in Article 23 of this Agreement; or

7.  Forfeits his Crew Member seniority but remains an employee with the Company.

### E.  TRANSFER TO MANAGEMENT OR OTHER POSITION WITH THE COMPANY

1.  A Crew Member that has completed his probationary period as defined in Article 19.A.2. of this Agreement and subsequently transfers to a management or any other position with the Company not covered by this Agreement shall retain and continue to accrue seniority on the Atlas Air Pilots' Master Seniority List,. Such an individual shall exercise his seniority if and when he elects to return to a Position covered by this Agreement and subject to his meeting all qualifications for the Position to which he is attempting to return.

2.  A Crew Member that transfers to a management or other position with the Company not covered by this Agreement before he has completed his probationary period will retain but not accrue any further seniority on the Atlas Air Pilots' Master Seniority List. Further, such an individual will be required to complete his probationary period upon his return to a Position covered by this Agreement.

3.  A Crew Member who is removed from his management or other position not covered by the Agreement, but retained by the Company, shall have a right to return to a Position covered by this Agreement in accordance with this Article 22.E.



# ARTICLE 23
Furlough and Recall

specific group of Crew Members, any offer shall be made on a uniform and non-discriminatory basis. The Company shall notify, meet and consult with the Union prior to making any offer pursuant to this paragraph.

## H. GENERAL

1. While at least one Crew Member is on involuntary furlough and has not been offered recall, each Active Crew Member's pay and credit shall be limited to a 130-hour cap per month, except any Crew Member Training Instructor (CTI) assigned to a Training Center to perform exclusively simulator training is excluded from the 130-hour cap.

   a. If the 130-hour cap set forth in Article 23.H.1., above, is exceeded in more than three (3) separate months in a rolling twelve (12) month period, whether by the same or different Crew Members, the maximum period of Longevity accrual referenced in Article 23.E.1., above, shall be extended as follows:

      i. From one (1) year to two (2) years as a result of the first instance where the 130 hour cap was exceeded in more than three (3) separate months in a rolling twelve (12) month period.

      ii. From two (2) years to three (3) years as a result of the second instance where the 130 hour cap was exceeded in more than three (3) separate months in a rolling twelve (12) month period, provided at least one individual Crew Member was on the same involuntary furlough during both instances where the cap was exceeded in more than three (3) separate months in a rolling twelve (12) month period. This Article 23.H.1.a.ii., shall not apply if all Crew Members on involuntary furlough during the first instance when the 130 hour cap was exceeded in more than three (3) separate months in a rolling twelve (12) month period are offered recall prior to a second such instance.

   b. In no case shall a Crew Member be entitled to more than three (3) years of Longevity accrual while on furlough.

   c. When the maximum period of Longevity accrual is extended pursuant to Article 23.H.1.a., above, that extended period of Longevity accrual shall also apply to other Crew Members who are subsequently furloughed, provided at least one Crew Member who was on furlough at the time the accrual period was extended remains on involuntary furlough and has not been offered recall at the time of the subsequent furlough.

2. A furloughed Crew Member may be entitled to on-line space-available transportation, and jump-seat privileges, on the Company's aircraft on the same basis as active Crew Members for a period of two (2) years from the effective date of furlough if permitted by TSA.



ARTICLE **23**
Furlough and Recall

3.  A furloughed Crew Member shall not perform any line Crew Member duties.

4.  For purposes of providing notices of furlough and recall pursuant to this Article, it will be sufficient for the Company to direct such notices to the Crew Member's most recent address and email address on file with the Company. It is the Crew Member's obligation to inform the Company of any changes in his residence address and email address.

5.   Crew Members on furlough will be allowed to update their standing bids pursuant to the applicable provisions of Article 24.B. of this Agreement.

6.  The provisions of Article 23.A.2.a., 23.E.2., and 23.E.3. shall not apply if the need to reduce staffing at a Base or to furlough a Crew Member is caused, in major part, by circumstances over which the Company has no control. The term "circumstances over which the Company has no control" includes, but is not limited to,

   a.  a natural disaster,

   b.  a labor dispute,

   c.  grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company,

   d.  reduction of flying operations because of a decrease in available fuel supply or other critical material either due to governmental action or suppliers being unable to provide sufficient fuel or other critical materials for the Company's operations,

   e.  revocation of the Company's operating certificate(s),

   f.  war emergency,

   g.  acts of terrorism,

   h.  owner's delay in delivery of aircraft scheduled for delivery,

   i.  manufacturer's delay in delivery of new aircraft.



ARTICLE **25**
Scheduling

the Crew Member a Secondary Line, or may reassign the Crew Member pursuant to Article 25.N.1.a. or Article 25.N.2., above, whichever is applicable.

b. If the Crew Member calls in sick prior to the Trip Pairing, the Company may assign the Crew Member a Secondary Line; may reassign the Crew Member pursuant to Article 25.N.1.a. or Article 25.N.2., above, whichever is applicable; may place the Crew Member on R-1; or may release the Crew Member from Duty for the remainder of the Trip Pairing. If the Company assigns the Crew Member to a new Trip Pairing, it may require the Crew Member to leave his residence within one (1) hour of the time of the call stating that he is fit for duty. The Company shall have four (4) hours to assign the Crew Member a new Trip Pairing, after which it must either assign the Crew Member a Secondary Line, place the Crew Member on R-1, or release the Crew member from Duty for the remainder of the Trip Pairing.

6. A Crew Member will not be required to keep the Company advised of his whereabouts while on vacation or on actual Days Off. This provision does not diminish a Reserve Crew Member's obligations to communicate with the Company as set forth in Article 31 of this Agreement.

**T. Out-Base Assignments**

1. At the Company's discretion, it may offer Out-Base assignments which may last up to an entire Bid Month. The number of Out-Base assignments, by fleet type, in a particular Bid Month shall not exceed seven percent (7%) of the total number of Crew Members assigned to that fleet type.

2. An Out-Base assignment will have no scheduled or required Days Off except as may be required by applicable FARs.

3. An Out-Base assignment shall be subject to the minimum rest provisions in Article 12.G.5.

4. The Company shall offer Out-Base assignments by system-wide seniority to qualified Crew Members (including but not limited to qualifications relating to equipment type, seat, visa requirements and other necessary qualifications for the Out-Base assignment to be filled).

5. The Company will post Out-Base assignments for bid on the first (1st) of the month prior to the assignment, and will award them by the sixth (6th) of that month. The posting shall include the date that the bid will close and the location of the Out-Base assignment. Out- Base assignments shall be voluntary.

6. The Company may decline a Crew Member's bid for an Out-Base assignment for any bid month in which the Crew Member may be required to attend training, is scheduled for vacation, or is subject to any other conflict.



ARTICLE
Scheduling
**25**

7. A Crew Member who has already been awarded a Bid Line of time for the month shall not be precluded from thereafter bidding an Out-Base assignment that is subsequently posted for the same month which, if awarded, will supersede his Bid Line for the month.

8. The Company shall have the right to cancel an Out-Base assignment, and the Crew Member shall have the right to withdraw from an Out-Base assignment once awarded. In either case, the following shall apply:

   a. If the Company cancels the Out-Base assignment or the Crew Member withdraws from the assignment prior to the award of the monthly Bid Lines, the Crew Member will be awarded a Line in accordance with the bidding procedures set forth in this Article.

   b. If the Company cancels the Out-Base assignment or the Crew Member withdraws from the assignment after the monthly Bid Lines have been awarded but before the Out-Base assignment has begun, the Company and the Crew Member shall mutually agree on a schedule that complies with this Article 25.

   c. If the Company cancels the Out-Base assignment or the Crew Member withdraws from the assignment after it has commenced, the Crew Member shall be given a new assignment or returned to his Base. If the Out-Base assignment has lasted for more than the maximum required number of Work Days in the Bid Month as provided in Article 25.A.1., above, the Crew Member shall be considered to have completed his Work for that Bid Month, and the Out-Base compensation that he is due pursuant to the terms of Article 3 shall be appropriately prorated. If the Out-Base assignment has lasted less than the maximum required number of Work Days in the Bid Month as provided in Article 25.A.1, above, he shall be treated as a Secondary Line Holder for the remainder of the Bid Month.

9. A Crew Member who has already been awarded an Out-Base assignment shall not bid for a line of flying for the Bid Month in which his Out-Base assignment is to occur. The Crew Member shall be assigned his flying at the discretion of the Company for the duration of his Out-Base assignment.

**U.  Scheduling Committee**

1. The Company recognizes a Union Scheduling Committee.

   a. The members of the Union Scheduling Committee will be provided with read-only access to crew schedules and aircraft schedules contained in the scheduling software system used by the Company.

   b. Based on the software system vendor's availability, Union Scheduling Committee

ARTICLE **26**
General

**Q. Time Limits in the Agreement**

All time limits contained in this Agreement that are expressed in "days" shall mean calendar days unless otherwise stated in this Agreement. The capitalized term "Day" shall have the meaning set forth in Article 2.

**R. Unsafe Conditions**

1. Nothing in this Agreement will be construed to require a Crew Member to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crew Member or his equipment.

2. The Company and the Union will establish a joint working group to discuss issues relating to the transport of lithium batteries, as well as other potential fire and/or smoke hazards, and how such hazards may be mitigated. The working group may make recommendations regarding fire prevention and suppression, including the acquisition of new technologies. If the working group cannot reach agreement, the representatives of either party may unilaterally draft a recommendation to the Company's Senior Vice President of Flight Operations and the Union's Local Union President for their review, consideration, and discussion.

**S. Flight Pay Loss Donations**

Crew Members shall be allowed to donate a portion of their pay to the Union for the purpose of off-setting the Union's Flight Pay Loss obligation to the Company. Any such donation will be implemented by a deduction from the Crew Member's paycheck or electronic direct deposit, as agreed upon by the Company and Union. The Company is not required to make such a deduction unless, at least ten (10) business days prior to the applicable Pay Day, the Company's payroll department has received from the Crew Member a written authorization, executed by the Crew Member, in a form acceptable to the Company. The provisions of this Article 26.S shall not be construed in a manner that would restrict the Company's ability to comply with applicable state and federal law.

**T. Navigation Publications**

It shall be the Company's responsibility to provide all Crew Members all electronic navigation publications as required by Federal Aviation Regulations. If the publication(s) are not available electronically, the Company shall maintain such publication(s) on the aircraft.

**U. Resignation**

A Crew Member who intends to voluntarily leave the service of the Company shall make every reasonable effort to provide the Company with a minimum of fourteen (14) days advance notice. The notice shall be in writing and directed to the Chief Pilot. If a Crew Member has completed

new hire training, the Crew Member's pay and benefits will continue until the effective date of resignation provided by the Crew Member. A Crew Member who provides at least fourteen (14) days advance notice of his resignation, and who does not call out sick during the notice period, unless he provides a doctor's note, shall be paid his accrued vacation in his final paycheck.

### V. Accident Investigation Team ("Go Team") Training and Activation

The Company will release from duty, upon request by the Union, up to three (3) Union Go Team members for up to four (4) Days per year for training to participate in accident investigations. In the event of a Company aircraft accident or incident, the Company will release from duty, upon request by the Union, up to four (4) Go Team member(s) identified by the Union. Should the NTSB Investigator-In-Charge not allow a particular Union Go Team member to participate, the Company will release a replacement member upon notification by and at the request of the Union.

### W. Picket Lines

The Union agrees that during the term of the Agreement there will not be any complete or partial strikes, picketing, slowdowns, unfair labor practice strikes, refusals to cross picket lines, sympathy strikes, work stoppages, secondary boycotts, withholding of services in whole or in part, concerted refusal to work normal overtime, or other cessation of work or disturbances economic or otherwise unless and until the parties' right to self-help mature under the Railway Labor Act, provided, however, that nothing herein shall be construed to limit the Union's right to engage in otherwise lawful informational picketing. This paragraph shall not alter or limit the Company's right, if any, to obtain a court order enjoining such conduct by the Union and or the Crew Members both collectively and individually  Nothing in this paragraph shall be construed, however, to limit the rights of the Union or the Atlas Crew Members to refuse to cross lawful strike picket lines established by or on behalf of pilots represented by any union lawfully certified or recognized pursuant to the Railway Labor Act.

### X. Non-Discrimination

The Company shall not discriminate against any Crew Member because of race, color, national origin, religion, creed, sex, age, disability, veteran status, marital status, or sexual orientation.

### Y. Electronic Processes and Postings

The Local Union President or his designee and the Company will meet and confer on the format of any electronic notifications or postings that may be required by this Agreement.

### Z. Observation Rides

Company requested jumpseat observation may be approved or denied by the Captain, except where:



ARTICLE
Insurance Benefits

**27**

and shall confer with the Union over the selection of the broker.

D.  The Company will secure an Agent that pays for any required medical, dental or vision emergency when a Crew Member becomes sick or injured while on duty for the Company outside the United States. A Crew Member who requires such treatment shall contact the Agent in accordance with current practices. A Crew Member will be returned to his Base or other mutually agreeable location if medically necessary. A required medical, dental or vision emergency is defined as an illness or injury which requiring immediate medical, dental or vision treatment.

E.  Crew Members receiving sick leave benefits shall remain eligible to receive benefits referred to in this Article 27 on the same basis as active Crew Members. Crew Members on a leave of absence shall be eligible to receive benefits referred to in this Article 27 in accordance with Article 13 of this Agreement.

F.  The Company shall provide, at no cost to Crew Members, an immunization plan that includes, at a minimum, the following vaccinations in accordance with the appropriate maintenance schedules:

1.  Yellow fever.

2.  Hepatitis A.

3.  Hepatitis B.

4.  Typhoid.

5.  Tetanus.

6.  Smallpox.

7.  Meningococcal.

8.  Annual flu vaccine.

9.  TB tine test.

10. Any other immunizations recommended by the current United States Center for Disease Control "Advice for International Travel" document.

G.  The Company shall continue to make Flexible Spending Accounts (FSAs) available to Crew Members to the maximum extent allowable by law.

ARTICLE 
Duration

This Agreement shall become effective on September 10, 2021 and shall continue in force and effect until five (5) years from the effective date of the Agreement, and shall renew itself without change thereafter, unless written notice by either party of intended change is served in accordance with Section 6, Title I of the Railway Labor Act, as amended, no more than two hundred and seventy (270) days prior to or any time thereafter.

**FOR ATLAS AIR, INC.**

John W. Dietrich
President and Chief Executive Officer

James A. Forbes
Executive Vice President and Chief Operating Officer

Jeffrey D. Carlson
Senior Vice President of Flight Operations

Scott Lindsay
Vice President, Crew Planning and Analysis

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION**

Captain David Bourne
Director, Airline Division

Captain Yngve Paulsen
President, IBT Local 2750