**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| PATRICK AKERLUND, MICHAEL ALZATI, ERIC W ANDERSON, MICHAEL G.  BALLARD JR., LARRY JAMES BEARCE JR., ROBERT BELLMAN, BENJAMIN BENDIBURG, GREGORY BERRY, LYNETTE BOTHA, CALEB BUEHRER, RICHARD BULLOCK, JON CARROLL, VERGIL CASKEY, JAMES CASTOR, NATHAN CHARBONEAU, SHAWN CHURCHEL, JOEL COLON, MARK CONNOR, MATTHEW CRONAUER, FRED CUNNINGHAM, ROYAL DANZA, ELLIOT DE SOUSA, ERIC DESANDRO, STEVE DIXON, JAMES ERICKSON, LUIS ESQUIVIA, LEE ESTES, ROBERT FRATTI, JASON FRISBIE, TIMOTHY FRYE, TONY GAMBOA, DENNIS GEBHARD, REZA GHODS, MARK GILMAN, ROBERT GIUDICE, ERIC GORDON, REXFORD T. HEIVILIN, JASON HENNING, DAVID HEWSON III, TODD HONTZ, DANIEL HUDSON, ROGER JUSTICE, VENANCIUS KASSANDJI, JOHN KEARINS, RICKY KINDER, BETH KIRBY, ANDREAS N. KOUSTAS, CHAD KRAVETZ, CARL LINDBERG, JOSEPH LOSCHIAVO, ANDREW LUTZ, BLYTHE LUTZ, RAFAEL MACARIO, DOUGLAS P. MAYO JR., APRIL MCQUILLEN, CHRISTOPHER MCQUILLEN, JEFFREY MICHONSKI, ANDREW MICKLER, COREY MORRIS, GREGORY MYERS, PETER NAPORA, JOEL PARDO, LANCE PHILLIPS, PATRICK PHILLIPS, GLEN PRONK, CHARLES RANDALL, PETER RAYMOND, JOSHUA ROBERTS, REBECCA ROBERTSON, JASON ROGERS, KIMBERLY SCHRECK, WILLIAM SERRITELLA, GENTRY SHELTON, TODD SNAZA, DONALD SORRENTINO, MARK SOUTH, MICHAEL STARK, ELIZABETH STONEKING, FORREST STOWELLS, BARBARA JANEICE SURBER, JOHN SWIFT, NICK TAYLOR, WILLIAM THOMPSON, BRANDON THOROUGHMAN, GERI TONDA, | Cause No. 1:22-cv-23519-KMM<br><br><br>Assigned to<br><br>Judge K. Michael Moore<br><br><br>Magistrate Judge Lauren F. Louis<br><br><br>**THIRD AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**RICARDO TORRES ABARCA, GUSTAVO VERDES, JAMES VILLELLA, FARSHAD ZARRABIAN**
individuals,

        **Plaintiffs,**

        v.

**ATLAS AIR INC.,** a Delaware corporation,

        **And**

**FLIGHT SERVICES INTERNATIONAL, LLC,**

a Texas limited liability company,

individuals**,**

        **Defendants**

.

## THIRD AMENDED COMPLAINT

### NATURE OF THE CASE

1.      Plaintiffs are pilots, flight attendants and ground staff of Atlas Air, Inc. ("Atlas") and its affiliated company Flight Services International, LLC ("FSI"), whose rights were brazenly violated in connection with Defendants' implementation of mandates, policies and procedures relating to COVID-19 vaccinations.

2.      This is an action for relief to redress Defendants' invasions of privacy, negligence, failure to accommodate, disparate treatment, creation of a hostile work environment, violations of the Genetic Information NonDisclosure Act ("GINA") and intentional and negligent infliction of emotional distress.   Such wrongful conduct was predicated on Defendants' unlawful discrimination, harassment, and retaliation against Plaintiffs.

3.      This action also seeks relief to redress Defendants' conduct, as federal government-type actors, redressing  violations of Plaintiffs' civil rights that are established through the Bivens case and elsewhere, on the basis that Defendants' conduct was indistinguishable from that of the U.S. Government and that Defendants' vaccine and mask mandates, as applied, violates privacy,

equal protection and due process protections secured by both the Constitution of Florida and the Constitution of the United States.

4.      Defendants used deception, discrimination, psychological and economic coercion, psychological manipulation, and physical isolation to force Plaintiffs, under threat of job termination, to participate in a dangerous social and medical experiment.

5.      Defendants have made Plaintiffs "second-class citizens"—often on the basis of their religious beliefs—within their respective companies and targeted them in a campaign of harassment designed to force Plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy and to submit to mask wearing which was then known to be useless in inhibiting the spread of COVID-19.

6.      Defendants' vaccine mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs.  Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never wanted to make: take an experimental gene-based therapy at the expense of their religious beliefs and/or health or lose their livelihoods and the means by which they provide for their families.

7.      Defendants purported to grant for a time Plaintiffs' religious 'accommodation' but continuously changed their standards and treatment, with an ever-present possibility of termination and immediately proceeded to deny them benefits and equal opportunities and created a hostile work environment by forcing Plaintiffs to wear individually identifiable symbols (facial masks) distinguishing them from their peers and gave public disclosure of their private and protected health information.

8.      Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the vaccine without any information on the potential risks or benefits. Several Plaintiffs

(and other Atlas employees) have suffered adverse side-effects and harm as a result of submitting to the vaccine.  In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

9.      This suit is further brought to redress the harms Defendants have dispassionately brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved.

## PARTIES

10.      Plaintiffs are divided in the following 4 categories:

11.      Atlas plaintiff are divided into the following 3 categories:

12.      **Plaintiffs Category 1 – 65 Unvaccinated Atlas Pilot Plaintiffs.**      These unvaccinated plaintiffs which are or were employed by Atlas were damaged by Atlas in, including but not limited to, the following manner: These Plaintiffs suffered hostile workplace harassment, invasion of privacy, discrimination and threats, including but not limited to continued threatened denial of religious and/or medical exemption from Atlas' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation are as follows:

Patrick Akerlund, Michael Alzati, Eric W Anderson, Larry James Bearce Jr., Robert Bellman, Benjamin Bendiburg, Gregory Berry, Lynette Botha, Caleb Buehrer, Richard Bullock, Jon Carroll, Vergil Caskey, James Castor, Nathan Charboneau, Shawn Churchel, Joel Colon, Mark Connor, Matthew Cronauer, Fred Cunningham, Royal Danza, Elliot De Sousa, Eric Desandro, Steve Dixon, James Erickson, Luis Esquivia, Lee Estes, Robert Fratti, Dennis Gebhard, Mark Gilman, Robert Giudice, Eric Gordon, Rexford T. Heivilin,

Jason Henning, David Hewson III, Todd Hontz, Daniel Hudson, Roger Justice, Venancius Kassandji, John Kearins, Beth Kirby, Joseph Loschiavo, Andrew Lutz, Blythe Lutz, Rafael Macario, Jeffrey Michonski, Andrew Mickler, Corey Morris, Gregory Myers, Peter Napora, Patrick Phillips, Glen Pronk, Charles Randall, Jason Rogers, William Serritella , Gentry Shelton, Todd Snaza, Donald Sorrentino, Mark South, Michael Stark, Forrest Stowells, John Swift, Nick Taylor, William Thompson, James Villella, Farshad Zarrabian.

13.      **Plaintiffs Category 2 – 13 Vaccinated Atlas Pilot Plaintiffs.** These vaccinated plaintiffs are still employed and who were damaged by Atlas in, including but not limited to, the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, including but not limited to threatened denial of religious exemption from Atlas' vaccination and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under law, who succumbed to Atlas' forcing them to take the vaccination, and also suffered and/or continue to suffer Vaccine Adverse Effects some reported to the VAERS system and some not reported, are as follows:

Michael G.  Ballard Jr., Jason Frisbie, Tony Gamboa, Reza Ghods, Ricky Kinder, Andreas N. Koustas, Chad Kravetz, Carl Lindberg, April McQuillen, Christopher McQuillen, Peter Raymond, Joshua Roberts, Gustavo Verdes.

14.      **Plaintiffs Category 3 – 6 Atlas ground employees, all 6** ground employee plaintiffs are unvaccinated and are or were employed by Atlas who were damaged by Atlas in, including but not limited to, the following manner: they suffered hostile workplace harassment, invasion of privacy, religious discrimination and threats, including but not limited to threatened denial of religious and/or medical exemption from Atlas' vaccination  and mask mandates, and who suffered retaliation from Atlas for being bona-fide whistleblowers entitled to protection under

law, are as follows:

Timothy Frye, Douglas P. Mayo Jr., Joel Pardo, Lance Phillips, Kimberly Schreck, Brandon Thoroughman.

15.    **Plaintiffs Category 4 – All 5 FSI plaintiffs. All 5 FSI plaintiffs are unvaccinated** plaintiffs which are or were employed by FSI who were damaged by defendants in, including but not limited to, the following manner: They suffered hostile workplace harassment, invasion of privacy, discrimination and threats, including but not limited to continued threatened denial of religious exemption from defendants' vaccination and mask mandates, who nevertheless were determined to hold out and did ultimately refuse to take the vaccination and thus suffered retaliation from defendants for being bona-fide whistleblowers entitled to protection under law, and suffered extreme harassment and humiliation are as follows:

Rebecca Robertson, Elizabeth Stoneking, Barbara Janeice Surber, Geri Tonda, Ricardo Torres Abarca

16.    Defendant **Atlas Air, Inc.** ("Atlas") is a Delaware corporation with its principal place of business in Purchase, New York. It is a wholly owned subsidiary of Atlas Air Worldwide Holdings, is a cargo airline, passenger charter airline, and aircraft lessor.[1]

17.    Atlas is a common carrier as defined under federal law.   Atlas has a massive presence in Florida, and specifically in this judicial district, with a hub, its training center and other operations. Its training center is located at 5600 NW 36th St., Miami, FL 33166. It consists

---

[1] A previous EEOC investigation into Polar Air, a subsidiary of Atlas, found that it had discriminated against female pilots by not allowing them to fly into the Middle East. Polar Air was ordered to pay the individual $50,000 and to modify their discrimination/harassment policy.

of 30,000 square feet of administrative and Instructional space, including the operation of six

flight simulation training devices. It "provides a wide range of advanced training solutions,

specializing in aircrew training for wide body B747 and B767s." It teaches "more than 10,000

pilots, flight engineers, flight attendants, and other aviation professionals each year."[2] The Atlas

Miami Training Center ("MTC") has more pilots in a day than any base or station on the globe.

All Atlas pilots are trained at the MTC, including annual or biannual recurrent training. There is

always a massive presence of Atlas pilots, crew and other personnel in Miami.

18.     Atlas' flight training has always, since inception, been in Miami. If Atlas were to

cease all operations at the MTC, it would cause a significant and detrimental impact on the

operations of Atlas world-wide. Pilots do *not* spend any significant time at Atlas' Purchase, New

York location.

19.     Several very important departments are based in Miami. The Vice President of

Ground Operations has his primary office at the MTC because he oversees the following

departments that are based at the MTC: Dangerous Goods, Special Loads and Ground Operations

Training.

20.     Defendant **Flight Services International, LLC** ("FSI") is a Texas limited

liability company with its principal place of business in Houston, Texas. It is a company whose

exclusive business is to contract flight attendants to Atlas Air. All the flight attendants who are

staffed on Atlas Air flights are contracted through FSI. FSI was founded by an Atlas contract

---

[2] *See*, https://www.atlasairworldwide.com/2022/04/training-new-atlas-air-pilots/ (noting that "as

pilots get their Atlas career off the ground, their first stop is Miami, <u>home</u> to the Atlas Air's

world class Training Center." *(Emphasis added).*

attorney and his spouse. All its employees receive all their training at the Atlas training facility in

Miami. All FSI flight attendants are trained at the MTC, including annual or biannual recurrent

training. There is always a significant presence of FSI personnel in Miami. FSI contracts its

flight attendants to Atlas Air and receives millions in dollars from Atlas Air in return.

## MISNOMER/ ALTER EGO

21.     In the event any parties are misnamed or are not included herein, it is Plaintiffs'

contention that such was a "misidentification", "misnomer," and/or such parties are/were "alter

egos" of parties named herein.   Alternatively, Plaintiffs contend that any "corporate veils"

should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this case under 28 U.S. Code §

1331 because the case arises under the Constitution, laws, or treaties of the United States.

23.     This Court has personal jurisdiction over defendants because under *International*

*Shoe* and its progeny, they have at least minimum contacts with Florida such that traditional

notions of fair play and substantial justice would not be offended by the exercise of jurisdiction.

In addition, personal jurisdiction is appropriate under Florida's long-arm statute, 48.193.

Defendants engaged in unlawful acts regarding the COVID-19 vaccine mandates through acts

within the state of Florida as well as acts outside the state of Florida that caused harm to

numerous plaintiffs in the state of Florida.

24.     Venue is proper in the U.S. Southern District of Florida because Atlas Air and its

affiliates, and leadership do a high percentage of their business and stage a high percentage of

their flights in and around southern Florida and the Miami International Airport. In addition, the

30,000 square foot Atlas Training Center, that trains 10,000 people per year, is located in this

judicial district as set forth above.

**BACKGROUND**

**A. The COVID-19 Pandemic and Vaccine Response**

25.     The United States government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus" (SARS-COV-2), commonly known as "COVID-19," that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

26.     Three (3) separate COVID-19 vaccines have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson.  None of the products are vaccines in the traditional meaning of the word.  Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the particular condition.  These products do not provide individuals with immunity from contracting COVID-19.  Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

27.     On or about September 11, 2021, the Centers for Disease Control ("CDC") dumbed down its official definition of "vaccination" from the traditional above-described definition "to prevent the disease," to now merely "the act of introducing a vaccine into the body to produce protection from a specific disease." On or around January 18, 2021, Merriam Webster diluted their definition of "vaccine" (after Moderna created their "vaccine") by adding an alternate subparagraph "b." to their definition which describes that the Moderna product codes the body to the produce spike protein which triggers an immune response.

**B.  Recent History of Vaccination Mandates & Accompanying Litigation.**

28.     Three realms of employment have been the primary issue in COVID-19 litigation: (i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

29.     First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors.  On January, 20, 2021, President Joe Biden signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic.[3]

30.     On September 9, 2021, Biden signed Executive Order 14042 ("EO 14042"),  to "promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."[4]

31.     On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[5]

---

[3] *See,* 86 Fed. Reg. 7,045-48 (Jan. 20, 2021).

[4] *See,* 86 Fed. Reg. 50,985-88 (Sept. 9, 2021).

[5] *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

32.     The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S.  The Eleventh Circuit Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[6]

33.     Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, NFIB v. OSHA.[7]

34.     On September 9, 2021, Biden announced "a new plan to require more Americans to be vaccinated."  This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[8]

35.     The declared purpose of the mandate was to increase vaccination rates at "businesses all across America," forcing eighty-four (84) million Americans to submit to the medical products.[9] Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII of the Civil Rights Act

---

[6] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[7] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[8] *Id.* at 663.

[9] *Id.* (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin.[10] The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.[11]

36.     Third, the U.S. Supreme Court on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare and Medicaid funding to require their employees to be vaccinated.[12] However, the Court held that a facility *must recognize* an individual's religious and medical accommodation/ exemption *requests* pursuant to the rule, and *must comport with* the obligations prescribed by Title VII.[13] *(Emphasis added).*

37.     Governments supporting these "vaccine" mandates rely on, and widely mis-cited *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), claiming the government can force vaccination. However, the government never did force smallpox vaccination on Jacobson. He merely paid a five dollar fine, so Jacobson is a *de minimis* precedent for Defendants.

38.     Like EO's# 13991, 14042 and similar edicts being judicially lifted/reversed, there are multiple recent litigation precedents where agencies have been judicially blocked from enforcing COVID mandates, and reversed, due to them exceeding many constitution guardrails,

---

[10] *See*, Fed. Reg. 61402-551 (Nov. 5, 2021).

[11] *Id.*

[12] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[13] *See,* 86 Fed. Reg. 61571-72.

not just those protecting religious freedoms.

39.    Recent cases in state and federal courts have struck down vaccine mandates under a variety of legal theories.  In New York City, workers fired over COVID mandates received reinstatement and full back pay after a court found the New York City Health Department had violated the separation of powers doctrine, violated the New York State Constitution's equal protection and procedural due process provisions, and that this mandate was arbitrary and capricious.  *See George Garvey, et.al. v. The City of New York, et.al*, Supreme Court State of NY Index # 85163/2022. In *State of Louisiana, et.al. v. Zavier Becerra et.al. Memorandum Ruling*, Case no. 3:21-CV-04370, wherein 24 states sued Biden's Secretary of Health and Human Services to successfully enjoin enforcement of COVID mask and vaccine mandates in federally funded Head Start children's programs, U.S. District Judge Terry A. Doughty found that the defendants have violated of the separation of powers doctrine, and the major questions doctrine, denying Defendants' Motion to Dismiss and/or for Summary Judgment, and instead granting Plaintiffs' Motion for Summary Judgment. In, *Health Freedom Defense Fund v Joseph R. Biden, Jr.,* 599 F. Supp. 3d. 1144 (M.D. Fla. 2022), U.S. District Judge Kathryn Kimball Mizelle lifted the CDC COVID mandates on airlines and on all U.S. public transportation conveyances by air, land or sea comparing such mandates to "detention and quarantine"; then discussing that the mandates were arbitrary, capricious, did nothing to actually prevent spread of disease, and that CDC illegally skirted its agency protocol by forgoing the public comment input before enacting the rules.[14]

40.    A common thread underlines all these cases, namely that a government cannot

---

[14] *Health Freedom Defense Fund v Joseph R. Biden*, Jr., 599 F. Supp. 3d. 1144 (M.D. Fla. 2022).

impose a vaccine mandate on citizens without express authorization by the legislature directly related to healthcare.  The existence of such particular legal authority is why the Medicaid and Medicare mandate was allowed to stand while other mandates without such express authority were overturned.

41.     While portions of this case do not rely on the nonexistence of any constitutional authority for Defendants' actions, they are supported by fact that there was a similar lack of authority for Defendants' actions within Atlas' and FSI's Collective Bargaining Agreements with their employees, including the Plaintiffs.  Just as a constitution sets forth the rights and responsibilities of citizens of a jurisdiction, a Collective Bargaining Agreement sets forth the rights and responsibilities of employees subject to that Collective Bargaining Agreement.

**C.  Interpretation of Religion under Title VII**

42.     One of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[15]  While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

43.     In addressing this Title VII issue, Plaintiffs contend that their "sincerely held religious beliefs" must be accorded protection under Title VII .  Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[16] Furthermore, this broad definition has been incorporated by the U.S. Equal Employment

---

[15] *See*, 42 U.S.C. § 2000e et seq.

[16] *See*, 42 U.S.C. § 2000(j).

13

Opportunity Commission ("EEOC") in promulgation of regulations pertaining to religious discrimination.

44.     Plaintiffs' sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

45.     Indeed, Plaintiffs contend that the term "religion", as it appears in Title VII, must be interpreted with equal breadth as the term "sex" has been interpreted.  Federal court precedents have interpreted the term "sex" to apply broadly to any discrimination that involves gender, including protections for pregnancy status, sexual orientation, and for transgender individuals. As such, the term "religion" must be interpreted equally broadly.

**D.  Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law**

46.     Plaintiffs possess sincerely held religious beliefs that their Creator planned their existence upon their creation, which included the creation and design of their unique genetic code, both DNA and RNA.  Plaintiffs' conscience prohibits them from being inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

47.     The "vaccines" in question are mRNA vaccines, which hijack a person's cells in the vicinity of an injection site in order to cause these cells to start making the same protein that is found in the COVID-19 virus.

48.     This type of "vaccine" differs significantly from standard vaccines, which do not hijack the human bodies own cells, but instead contain live or dead viruses.

49.     Plaintiffs' sincerely held religious beliefs are commonly shared by millions of people around the world.

50.     Plaintiffs' religious beliefs are not based upon social, political, economic, or personal philosophies.

51.     Plaintiffs' religious beliefs based on the teachings of globally accepted religions that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

52.     Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

## GENERAL ALLEGATIONS

### A.  The COVID-19 Pandemic and Response

53.     By mid-March 2020, even though the untreated mortality rate was below one half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

54.     The three "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to Emergency Use Authorizations (EUA)'s.

55.     Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, available curative and prophylactic alternatives, and of the extent to which such benefits and risks are unknown.[17]  "Consent" establishes that all persons must have the option to refuse administration of the product.

---

[17] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(II).

Punishments or consequences for refusing medical products are strictly prohibited based on the express wording and intent of the law.[18]

56.     As such the FDA's grant of an EUA is still subject to informed consent requirements in order to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product."[19]

57.     Plaintiffs are not unique or abhorrent; millions of Americans have also refused to take these experimental medical products for numerous reasons, including for religious reasons.

58.     COVID-19 vaccines are Virus-Based Gene Therapies ("VBGT") according to the FDA's own definition.[20] Thus, these medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's own genetic information.

59.     These genetic alterations are prohibited by Plaintiffs sincerely held religious beliefs and objections to these alterations. Further, these VBGT's were developed using stem cells harvested from human embryos. Plaintiffs have a conscientious duty to refuse participation in activities repugnant to human life and dignity.

60.     The FDA approved the Pfizer Comirnaty vaccine on August 23, 2021, and on September 9, 2021, Biden signed EO 14042. Thus, Defendant Atlas sent an electronic communication to all Atlas employees and announced all Plaintiffs would be required to be "fully vaccinated" with a COVID-19 VBGT pursuant to EO 14042 by December 8, 2021.

---

[18] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III).

[19] *Id.*

[20] *See*, https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy

**B.  Atlas' Vaccine Mandate Due to Government Orders**

61.    In October 2021, Atlas originally stated:

> As a Company, we support the views of health experts that [the
>
> VBGT] reduce the impact and spread of COVID-19. That said,
>
> we have been consistent in our position that [a VBGT] is a
>
> personal choice and we were not planning to mandate
>
> [VBGT's] for our employees. However, we are now required
>
> to comply with [EO 14042].[21]

62.    Yet, Defendant's palpably disingenuous concerns about safety overwhelmingly

support Plaintiffs' decisions to *not* be injected with a COVID-19 VBGT.

63.    Plaintiffs' reluctance to take the VBGT was supported by Defendants' own

actions, since Defendants: (i) did not mandate any passenger flying on its aircraft or interacting

with its staff to be vaccinated; (ii) did not mandate VBGT's for employees from other countries,

(even though many Plaintiffs worked on the same aircraft and had contact with them); and (iii)

did not mandate VBGT's for pilots from other airlines allowed to ride in the "jump seat" of any

Atlas aircraft.

64.    On October 5, 2021, Atlas and FSI sent electronic communication to all plaintiffs

informing that they would have to comply with the government mandates and all employees

would have to be vaccinated. Only a week later, on October 11, Atlas and FSI emailed all

plaintiffs with instructions on how to apply for a medical and/or religious exemptions.

---

[21] After the Biden Administration's mandate was enjoined by various federal courts, Atlas

immediately reverted to a company-directed mandate.

65.     On the same electronic communication above, Atlas and FSI informed all plaintiffs that they must digitally report their vaccination status and that they must file for religious and/or medical exemptions to avoid VBGT inoculation. Pilots and flight attendants were falsely told that the information would be protected.  Atlas pilots' and FSI flight attendants´ private vaccination status was disseminated to other employees under the supposed need to circulate the information about which crewmembers (vaccinated or unvaccinated) would qualify for certain flights involving company imposed COVID-19 restrictions.  For no valid medical reason, **Category 1 unvaccinated Atlas pilots** and **Category 4 FSI flight attendants** received less flight opportunities than vaccinated ones from Atlas and FSI, respectively.

66.     Defendants set October 22, 2021, as the deadline "for [Plaintiffs] to request an exemption due to medical or religious reasons."  No due date for a response was given by Defendants.

67.     Then, Defendants directed that November 25, 2021 was the deadline for Plaintiffs who did not apply for a religious or medical exemption to "report [their VBGT] status to the Company."

## C.  FSI's Vaccine Mandate

68.     FSI, whose sole business and source of revenue is through Atlas contracts, quickly followed suit and in early September 2021, FSI President Joni French sent an e-mail to Plaintiffs that made brazenly explicit the disparate treatment and hostility toward Plaintiffs.  She wrote:

> The health and safety of all our Cabin Crewmembers remains a
> top priority for FSI. To support your well-being, as well as that
> of your work colleagues, we encourage everyone to pursue the

> [VBGT]. Cabin Crewmembers who have proof of [VBGT] will
>
> increasingly be able to operate with more flexibility under less
>
> restrictive quarantine rules.
>
> We are pleased to let you know that we will now provide 5
>
> hours of additional compensation to every FSI Flight Attendant
>
> who receives [a VBGT] and submits a copy of their
>
> vaccination card.[22]

69.     Plaintiffs' lives were effectively placed on hold after October 2021 due to Defendants' continuous threats of unpaid leave and termination.

**D.  Atlas' Government-Directed Mandate Turns Into A Company-Directed Mandate**

70.     Plaintiffs applied for religious accommodation from the vaccine mandate prior to October 22, 2021.

71.     On January 13, 2022, The Supreme Court of the United States blocked the OSHA mandate requiring businesses with over 100 employees to impose vaccine and testing requirements.

72.     On or about January 25, 2022, in light of the Supreme Court's ruling, OSHA announced it was withdrawing its vaccine and testing requirements that were at issue. However,

---

[22] It is important to note that the term "vaccination" does not refer to a single event or transaction in this paragraph. Every new requirement by Atlas to take a booster to maintain "vaccination" status constitutes a new occurrence or transaction for the purposes of accommodation analysis under Title VII. Each transaction or occurrence rests upon a different set of operative facts.

Biden called upon businesses to voluntarily impose the mandates themselves.[23]

73.     Despite their previous statements that they believed in personal choice when it came to the VBGT mandate issues and were only reluctantly abiding by federal law, the Defendants nevertheless immediately complied with the new direction issued by the Biden Administration and announced, through electronic communications to Plaintiffs, that they would do as the President "suggested" that business that rely on federal contracts for business do.

74.     On January 25, 2022, Atlas sent out a communication stating:

> Earlier today, you received notice that all U.S. employees who must travel as an essential function of their position must be fully vaccinated by May 1, 2022. *This policy applies to you*. We recognize that you previously sought an accommodation from the COVID-19 [VBGT] mandates the company previously implemented to comply with [EO 14042] (applicable to federal contractors) and OSHA's Emergency Temporary Standard (applicable to employers with more than 100 employees). (Emphasis added).

75.     In that same communication, Atlas indicated that Plaintiffs would not be allowed to submit new medical or religious accommodation requests, but that the current exemptions would be reprocessed.

> Given your requests for accommodation from the Company's

---

[23] *See* https://khn.org/morning-breakout/biden-disappointed-by-courts-decision-urgesemployers-to-require-covid-shot/

previous COVID-19 vaccination mandates, the Company is
assuming you are seeking a request for accommodation from
the vaccine policy that will take effect May 1, unless you
respond to this email and indicate otherwise by Friday, January
28, 2022. If you do not respond by January 28, the Company
will process your new request for accommodation based on the
information already in its possession and follow-up with you
thereafter to identify any reasonable accommodations the
Company can offer without undue hardship.

76.     On March 8, 2022, Atlas Plaintiffs pilots Categories 1 & 2 who worked for Atlas,
received a communication from upper management stating that if they were not vaccinated by May
1, 2022, they would be placed on an unpaid leave of absence or reassignment regardless of the fact
they had previously requested an accommodation. On March 25, 2022, Atlas walked back their
statement and decided to allow unvaccinated pilots to continue working past May 1st as long as
they submitted to monthly testing and masking.  Atlas Plaintiffs who were unvaccinated were left
in a continued state of legal, emotional and career limbo.

77.     Atlas Plaintiffs were left with the impossible choice of taking COVID-19 VBGT at
the expense of their deeply held religious beliefs or be terminated.  **Plaintiff Category 2**
succumbed to the pressure and took the VBGT. After the implementation of the VBGT mandate,
all unvaccinated Plaintiffs were subjected to repeated harassment and disparate treatment within
the company for their deeply held religious beliefs.

78.     Defendants required unvaccinated Plaintiffs to wear the proven useless COVID-19
face masks which unlawfully required them to advertise their medical status and their objection to

21

the VBGT, and unlawfully required them to distinguished themselves from their peer groups by and amplifying their personal protected health information to their peers and to the public.

79.     Theoretically, a "vaccinated" employee should have immunity to the disease and therefore bare no risk from the medical choices of another. However, Atlas CEO John Dietrich continued to discriminate against Plaintiffs by disseminating recorded video and oral statements that employees were unsafe around Plaintiffs whose religious or medical circumstances barred inoculation.

80.     Plaintiff James Villella was damaged in the following manner: Plaintiff is a Boeing 737 Atlas pilot Captain that only flies domestic routes and requested a religious exemption to both vaccinating and testing but was issued the same blanket exemption that required him to be tested. After trying for 7 months to clarity his situation, Atlas attempted to get Plaintiff to change, alter, or abandon his religious beliefs and to submit to their COVID-19 testing policy. Villella was unjustly subjected to an "Article 19" disciplinary hearing in a blatant act of retaliation, harassment and discrimination. After having to defend himself of accusations of blatantly disregard for the company vaccination policy, and other libelous accusations, Plaintiff was removed from flight status and put on a desk job for approximately 3 months under

threat of being terminated for refusing to test due to his sincerely held religious beliefs. [24]

81.     For Plaintiffs whose religious exemptions were granted, Defendants continuously harassed Plaintiffs to disregard their conscience and/or health and submit to vaccination. This includes but is not limited to those plaintiffs listed above in Plaintiffs Categories 1, 3 & 4.  Atlas and FSI disseminated the VBGT status of every Plaintiff in emails that were published showing the last name, employee number, and VBGT status of Plaintiffs, and gave public disclosure of protected health information. In addition to that, Atlas discriminated against unvaccinated Plaintiffs in **Plaintiffs Category 1** listed above and denied them bids for higher paying flights to certain destinations despite such destinations having no laws or restrictions against unvaccinated Plaintiffs.

---

[24] Atlas' claim that they could not accommodate Villella's accommodation request due to undue hardship was totally meritless. Contrary to Atlas' assertions, Villella operates on domestic flights, and thus no hotel restrictions or other restrictions that apply to international operations are applicable to him. Villella's accommodation request was to continue operating and following the same process (screening for COVID-19, as the CDC stated was appropriate for people without symptoms for COVID-19) all Atlas Air employees had been following for the entire COVID-19 pandemic up to May 1st, 2022, when the new Atlas testing "policy" took place. Since Atlas only had to accommodate this single individual, no undue hardship existed as Atlas claims since only one employee requested this accommodation *seven months* prior to the testing policy being implemented, and *two months* prior to the first communication received by Atlas about a mandatory COVID-19 testing policy.

### E.  FSI Changes Religious Accommodations For All Flight Attendants

82.      On March 8, 2022, Plaintiffs who worked for FSI, received a communication from FSI President Joni French stating that if they were not vaccinated by May 1, 2022, they would be placed on an unpaid leave of absence regardless of the fact they had previously requested an accommodation.   Twenty-three days later, on March 31, 2022, FSI informs Atlas it would no longer require Flight Attendants to be vaccinated or virus tested and that they can continue working after May 1st.  Atlas' testing requirement would become effective May 1, while FSI's ended on that date.

### F. Atlas Changes Religious Accommodations For All Pilots And Ground Employees

83.      On March 25, 2022, Atlas attempted to mollify Plaintiffs by purporting to assure them that – despite maintaining a private company-wide VBGT mandate – those who had previously obtained a religious exemption pursuant to EO 14042 would be allowed to return to their regular work duties after the May 1, 2022 company vaccine mandate deadline "so long as they undergo requisite COVID-19 testing at their expense." Atlas' testing requirement would become effective May 1, 2022 while FSI's ended on that date.

84.      Atlas ordered its unvaccinated employees, even after they had established natural immunity from the disease, to test weekly (ground employees) or monthly (pilots and flight attendants) for COVID-19 unlike employees without religious beliefs who were deemed "vaccinated" by the Defendants.

85.      On April 21, 2022 Atlas sent Plaintiffs an updated Atlas COVID-19 Vaccination & Testing Policy now mandating that all COVID-19 **testing be videotaped** and retained by plaintiffs so that the videos could be sent to the company if requested.

### G.  Defendants' Failure to Accommodate, Disparate Treatment and Creation of A Hostile Work Environment In Violation Of Title VII

86.     Defendants' actions against Plaintiffs have violated Title VII's prohibition against the denial of equal opportunity and discrimination and perpetuated a hostile work environment.

87.     Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance.  Specifically, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, *religion*, sex, or national origin…[25] *(Emphasis added).*

88.     Regardless of whether the VBGT mandate was held Constitutional (for healthcare workers regulated by a specific statutory scheme), employers are still bound to fulfill their obligations to employees pursuant to Title VII.  These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing or retaliatory conduct.

89.     As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination, but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work

---

[25]  *See,* 42 U.S.C. § 2000e-2.

environment or harassment.

90.     Given the foregoing disparate treatment set forth in the facts herein, Defendants'

conduct had a disparaging impact on Plaintiffs.

91.     Defendants' conduct satisfies the elements for claims of religious discrimination

due to disparate treatment, failure to provide accommodations, harassment, and the creation of a

hostile work environment.

**H.  U.S. Equal Employment Opportunity Commission's ("EEOC") Failure To Mitigate**
**Injury And Plaintiffs Ongoing Irreparable Harm**

92.     All Plaintiffs have satisfied the requirement for exhaustion of administrative

remedies.

**CAUSES OF ACTION 1-5 AGAINST ATLAS**

**----  COUNT I  ----**

**Invasion of Privacy - Public Disclosure of Private Facts**

93.     **Count I pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in**
**paragraphs 12, 13, 14 above.**

94.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-

67, and 70-81 from above as though fully set forth herein.

95.     Atlas gave publicity to Atlas Plaintiffs protected private health information

("PHI") by publishing the PHI throughout the company and by forcing Atlas Plaintiffs to wear

political symbols, including functionally useless face masks, effectively amplifying and

broadcasting their PHI to other employees and consumers.

96.     The publication of Atlas Plaintiffs' PHI would be highly offensive to a reasonable

person and is of no legitimate public concern.

97.     As a proximate result of Atlas' public disclosure of Atlas Plaintiffs' PHI, said Plaintiffs have suffered injury. Atlas is liable to said Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

## ---- COUNT II ----

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.

### Defendants' Creation of a Hostile Work Environment

98.     **Count II pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

99.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-67, 70-81, 83-85, and 86-91 from above as though fully set forth herein.

100.     Atlas engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

101.     Atlas Plaintiffs suffered discrimination and disparate treatment at the hands of Atlas based on said Plaintiffs' protected religious and other protected characteristics and classifications.

102.     Atlas' conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

103.     Atlas' conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of Atlas and Atlas Plaintiffs.

104.     Plaintiffs were qualified to perform their duties as demanded by their employment.

105.     In good-faith, Atlas Plaintiffs undertook all requisite and applicable procedures to inform Atlas of the harassment and toxicity that was pervasive around the workplace.

106.     Atlas' actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

107.     Atlas Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

108.     Atlas Plaintiffs are members of several protected classifications.

109.     Unvaccinated Category 1 & 3 Atlas Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines.  Atlas' repeated attempts to coerce said Plaintiffs to go against their religious beliefs was unwelcomed harassment.

110.     Additionally, after refusal to submit to unwelcomed and offensive actions against the Atlas Plaintiffs religious beliefs, Atlas subjected unvaccinated Atlas Plaintiffs Categories 1 & 3 to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on such Plaintiffs' sincerely held religious beliefs as a protected class under Title VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

   (i) Atlas' creation of inflexible policies that directly target Atlas Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-

claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii)     Severe and persistent pressure to take VBGT's;

(iii)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Atlas against unvaccinated Atlas Categories 1 & 3 Plaintiffs,  as compared to similarly situated Atlas Category 2 employees who folded and allowed themselves to be inoculated with one or more of the three VBGT's

(iv)     Unwelcomed comments about Categories 1 & 3 Plaintiffs' religious beliefs;

(v)      By committing the actions complained here, Atlas did openly violate the Collective Bargaining Agreement (CBA) between Teamsters and Atlas, which actions intentionally contributed to the toxic hostile workplace environment. The CBA at Article 1.a.4 (prior clause in effect at all times pertinent herein) and current version Article 26 R.1 both of which reiterate the Title VII prohibitions against discrimination based upon sex, religion, age.  Atlas also violated Article 26 R.1 which assures that employee-crew members will not be required to take any action which may result in any risk of harm, whereas said crew members assert that the required vaccination and masks posed such risk of harm.

(vi)     Atlas' intentional dissemination of Atlas Plaintiffs' PHI and vaccination status to customers, to Atlas employees, agents, and supervisors by forcing said Plaintiffs to wear facial masks which don't work and thus serve no other purpose than identifying "dissident" employees with the masks as political symbols, thus differentiating the masked dissidents from other subdued Category 2 employees who received VBGT's;

29

(vii)   Abuse of power by Atlas, who compelled managers and supervisors to make unreasonable demands of Atlas Plaintiffs during the course of their job responsibilities;

(viii)  Psychological harassment by blatant rejection of Atlas Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate Atlas Categories 1 & 3 Plaintiffs.

(ix)    Retaliatory conduct in response to Categories 1 & 3 Plaintiffs' filing declination of vaccination forms and filing religious and/or medical accommodation forms;

(x)     Seeking to replace Atlas Category 1 & 3 Plaintiffs' employment positions with individuals who did not seek religious and/or medical accommodation(s).

(xi)    Atlas Defendants disproportionately higher compensated employees who did not seek religious accommodation, especially rewarding those vaccinated Category 2 Atlas employees with less restrictions, more flexibility in scheduling and greater opportunities all around.

(xii)   Atlas' intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii)  Failing to participate in a meaningful manner or otherwise engage with Atlas Plaintiffs regarding their religious and/or medical accommodation.

111.    Atlas Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by Defendants.

112.    Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which Atlas engaged in such

discriminatory conduct against Atlas Categories 1 & 3 Plaintiffs.

113.    Atlas' egregious above-described conduct toward Atlas Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.   Atlas Category 2 Plaintiffs buckled to the pressure and were released from under the discriminatory practices; Categories 1 & 3 Plaintiffs resisted and stood firm enduring the hardships deftly manufactured by Atlas.

114.    Atlas is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

115.    Atlas is directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

116.    Accordingly, Atlas had actual knowledge of the above-described actions of its individual managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by the corporate Atlas entity itself.

117.    Over the course of their employment, Atlas Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Atlas' conduct toward the (unfavored) unvaccinated Categories 1 & 3 Plaintiffs and their disparate treatment singling them out from the (favored) vaccinated Category 2 Plaintiffs.

118.    Atlas, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

119.    Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

120.     The systematic discrimination, as previously set forth, further adversely affected the Atlas Plaintiffs through Atlas' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of the hated class of "Anti-Vaxxers."

121.     Atlas failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

122.     This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

123.     Atlas' policies are only targeted at Atlas Plaintiffs Categories 1 & 3 and like-situated persons with conscientious objections to VBGT's.

124.     Atlas' egregious discriminatory conduct, given the totality of circumstances, raises to a level at which an objectively reasonable person could find constitutes a hostile work environment.

125.     The actions of Atlas, as set out herein, violate Title VII.

126.     As a result of Atlas's conduct, the Atlas Categories 1 & 3 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.  The Category 2 vaccinated Atlas Plaintiffs suffer as well with physical disabilities due to adverse vaccine events, grounding at least one pilot from all flying.

127.     Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the

said Plaintiffs.

128.     Filing complaints or charges with the EEOC was futile for Plaintiffs, however, all of them have satisfied the requirement for exhaustion of administrative remedies.

---- COUNT III ----

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

129.     **Count III pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

130.     Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, and 83-85 from above as though fully set forth herein.

131.     Atlas Plaintiffs are citizens of the United States.

132.     At all times relevant hereto, Atlas was a government actor and a person acting under the color of law. That is, Atlas has taken decisive employment actions that have caused Atlas Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling Atlas' actions whether through incentive or threat.

133.     Atlas is also acting under color of law as it has conspired with Government officials to leverage Atlas Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire said Plaintiffs' personal, genetic information.

134.     Atlas and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Atlas Plaintiffs' Constitutional rights. Through private and public

33

meetings, executive orders, and unlawful coercion and duress, Atlas has acted in concert with the federal government at the expense of their employees including Atlas Plaintiffs.

135.    First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

136.    Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

137.    Applied here, Atlas Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by Atlas by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

138.    This privacy right also includes Atlas Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, Atlas violated Atlas Plaintiffs' privacy rights when they broadcast their private information in memos, and published Plaintiffs PHI by forcing them to wear symbols, especially viciously targeting Atlas unvaccinated Plaintiffs Categories 1 & 3.

139.    Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

No state shall make or enforce any law which shall abridge the

34

privileges or immunities of citizens of the United States; nor shall

any state deprive any person of life, liberty, or property, without

due process of law, nor deny to any person within its jurisdiction

the equal protection of the laws."

140.    After the announcement of EO 14042, vaccinated employees received preferential treatment compared to Atlas Plaintiffs who had not been vaccinated, which included increase in pay, preferential scheduling, additional benefits and privileges.

141.    Atlas knowingly and willfully discriminated against Atlas Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

142.    Atlas, by allowing similarly situated Atlas Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

143.    While the vaccine mandate appeared neutral on its face, in practice it denies Atlas Plaintiffs equal protection under the law.

144.    Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by Atlas' conduct.

145.    Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

146.     Atlas Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

147.     The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes Defendants as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

148.     Here, Atlas' actions are those of a federal government-type Actor (parallel to the State actor definition in Title 42 USC 1983 but specifically applied to the federal government within the holding in Bivens vs.  Six Unknown Named Agents, 403 U.S. 388 (1971)) and, while courts have recognized a compelling state interest in controlling the spread of infections, Atlas lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

149.     Assuming the VBGT's could be said to satisfy the interest of preserving public health, Atlas' mandate is not narrowly tailored since it is not the least restrictive means necessary, and there are numerous less restrictive means to serve the same interest of public health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to provide greater protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin.

150.    As a direct and proximate result of Atlas' policies, practices, regulations and conduct, Atlas Plaintiffs have suffered harm.

151.    The conduct of Atlas as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

152.    Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Atlas deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Atlas Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- **COUNT IV** ----

**Infliction of Emotional Distress (intentional or in the alternative negligent)**

153.    **Count IV pertains to Atlas Plaintiffs Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

154.    Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-60, 61-67, 70-81, 83-85, 95-97 and 100-128 from above as though fully set forth herein.

155.    Atlas acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

156.    Atlas' conduct has been and continues to be extreme and outrageous.

157.    As a proximate result of Atlas' actions, Atlas Plaintiffs have suffered severe emotional distress.

158.    The harm caused by Atlas was a reasonably foreseeable consequence of Atlas'

conduct.

159.     Atlas Plaintiffs allege that Atlas acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of Atlas Plaintiffs with respect to the conduct set forth in this Second Amended Complaint.  However, if upon proof it is determined such conduct does not to rise to such intentional level, Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

160.     As a proximate result of Atlas' conduct, Atlas Plaintiffs have suffered serious and/or severe emotional distress.

161.     The harm caused by Atlas was a reasonably foreseeable consequence of the Atlas' conduct.

162.     Atlas is liable to Atlas Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Atlas Plaintiffs not limited to but including emotional and mental harm, as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitations, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.). Additionally, there were actual adverse vaccine events and physical harm/complications that affected the vaccinated Atlas Plaintiffs in Category 2.

---- **COUNT V** ----

**Negligence**

163.     **Count V pertains to Atlas Plaintiffs in Categories 1, 2, and 3 listed in paragraphs 12, 13, 14.**

164.    Atlas Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 61-67, 70-81, and 95-97 from above as though fully set forth herein.

165.    Atlas owes Atlas Plaintiffs a duty that has been breached.

166.    The duty Atlas owes to Atlas Plaintiffs is the standard duty of employer to employee of reasonable care during the regular course of operating their business.

167.    This duty includes protecting Atlas Plaintiffs' PHI via appropriate means and procedures.

168.    Atlas breached this duty of care by, including but not limited to, publishing Atlas Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear useless facial masks which accomplished nothing more than political advertising which effectively amplified and broadcasted said Plaintiffs' PHI (unnecessarily) to other employees and consumers.

169.    Defendants' negligence was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct.

170.    As a proximate cause of Defendants negligence, Plaintiffs have suffered injury.

**CAUSES OF ACTION 6-10 AGAINST FSI**

**----  COUNT VI  ----**

**Invasion of Privacy - Public Disclosure of Private Facts**

171.    **Count VI pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

172.    Category 4 FSI Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, and 82 from above as though fully set forth herein.

173.    FSI gave publicity to Category 4 Plaintiffs' protected private health information ("PHI") by publishing the PHI throughout the company and by forcing Category 4 Plaintiffs to

39

wear face masks, effectively amplifying and broadcasting their Protected Health Information (PHI) to other employees and consumers.

174.     The publication of Category 4 Plaintiffs' PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

175.     As a proximate result of FSI's public disclosure of Category 4 Plaintiffs' PHI, Category 4 Plaintiffs have suffered injury. FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  Because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to said Plaintiffs.

**----  COUNT VII  ----**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**

**Defendants' Creation of a Hostile Work Environment**

176.     **Count VII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

177.     Category 4 Plaintiffs Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, and 86-91 from above as though fully set forth herein.

178.     FSI engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, et seq.

179.     Category 4 Plaintiffs suffered discrimination and disparate treatment at the hands of FSI based on said Plaintiffs' protected religious and other protected characteristics and classifications.

180.     FSI's conduct was so severe or pervasive that it altered the terms, conditions, or

privileges of employment.

181.    FSI's conduct was not authorized and was, in fact, prohibited by the terms of Collective Bargaining Agreement that governed the employee-employer relationship of FSI and Category 4 Plaintiffs.

182.    Category 4 Plaintiffs were qualified to perform their duties as demanded by their employment.

183.    In good-faith, Category 4 Plaintiffs undertook all requisite and applicable procedures to inform FSI of the harassment and toxicity that was pervasive around the workplace.

184.    FSI's actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

185.    Category 4 Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

186.    Category 4 Plaintiffs are members of several protected classifications.

187.    Unvaccinated (Category 4) FSI Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccine, and FSI repeated attempts to coerce Category 4 Plaintiffs to go against their religious beliefs was unwelcomed harassment.

188.    Additionally, after refusal to submit to unwelcomed and offensive actions against Category 4 Plaintiffs' religious beliefs, FSI subjected said Plaintiffs to consistent psychological pressure that included discriminatory, harassing, coercing, and intimidating conduct based, at least in part, on said Plaintiffs' sincerely held religious beliefs as a protected class under Title

VII, 42 U.S.C. 2000e, et seq. which conduct included but was not limited to:

(i)      FSI's creation of inflexible policies that directly target Category 4 Plaintiffs on the basis of their religion, and on the basis of their status as bonafide whistleblowers under applicable law including Florida Private Whistleblower Act, Section 448.102(3) et.seq., and on the basis of their status as protected persons-claimants under Title 42 U.S.C. 12101, et seq. and 29 U.S.C. 794 American With Disabilities and Rehabilitation Act;

(ii)     Severe and persistent pressure to take VBGT's;

(iii)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of FSI as compared to similarly situated employees who received one or more of the three VBGT's

(iv)    Unwelcomed comments about Category 4 Plaintiffs' religious beliefs;

(v)     FSI's intentional dissemination of Category 4 Plaintiffs' PHI and vaccination status to customers, FSI employees, agents, and supervisors by forcing said Plaintiffs to wear useless face masks which differentiate them from other employees who received VBGT's;

(vi)    Abuse of power by FSI, who compelled managers and supervisors to make unreasonable demands of Category 4 Plaintiffs during the course of their job responsibilities;

(vii)   Psychological harassment by blatant rejection of Category 4 Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate said Plaintiffs.

(viii)  Retaliatory conduct in response to Category 4 Plaintiffs' filing declination of

vaccination forms and filing religious accommodation forms;

(ix)    Seeking to replace Category 4 Plaintiffs' employment positions by individuals who did not seek religious accommodation.

(x)     FSI disproportionately compensated employees who did not seek religious accommodation.

(xi)    Offensive or derogatory jokes in the office;

(xii)   FSI's intentional unwillingness and/or inability to train its agents, employees, managers, or supervisors concerning Plaintiffs' rights under Title VII of the Civil Rights Act of 1964;

(xiii)  Failing to participate in a meaningful manner or otherwise engage with Category 4 Plaintiffs regarding their religious accommodation; and/or

189.    Category 4 Plaintiffs' subjugation to such conduct was motivated on religious grounds and was unlawfully authorized, ratified, encouraged, and condoned by FSI.

190.    Category 4 Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion," was a major motivating factor by which FSI engaged in such discriminatory conduct against said Plaintiffs.

191.    FSI's egregious conduct toward Category 4 Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

192.    FSI is responsible for the creation of a toxic hostile work environment under a theory of vicarious liability or direct liability.

193.    FSI was directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

194.     Accordingly, FSI had actual knowledge of the actions of its managers and supervisors based on its involvement or, conversely, had constructive knowledge of such conduct based on the internal organizational policies advanced by FSI and Atlas.

195.     Over the course of their employment, Category 4 Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding FSI's conduct toward said Plaintiffs and their disparate treatment.

196.     FSI's supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

197.     Defendants, through its agents and employees, developed and encouraged animus against Plaintiffs because of their conscientious objections.

198.     The systematic discrimination, as previously set forth, further adversely affected the Category 4 Plaintiffs through FSI's promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "Anti-Vaxxer."

199.     FSI failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

200.     This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

201.     FSI's policies are only targeted at Category 4 Plaintiffs and like-situated persons with conscientious objections to VBGT's.

202.     FSI's egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work

environment.

203.     The actions of FSI, as set out herein, violate Title VII.

204.     As a result of FSI's conduct, Category 4 Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.

205.     FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression.  FSI deliberately acted in either a conscious and intentional disregard of the high probability of injury to said Plaintiffs or, conversely, did deliberately act with indifference to the high probability of injury to the Plaintiffs.

206.     Filing complaints or charges with the EEOC is futile, however, most of the Plaintiffs have done so.

---- **COUNT VIII** ----

**Violation of Title 42 U.S.C. § 1983, *et seq*. or in the alternative violation of rights set forth in the <u>Bivens</u> case and its progeny; Defendants' Invasion of Privacy, Denial of Equal Protection and Due Process of Law**

207.     **Count VIII pertains only to Plaintiffs in Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

208.     Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, and 82 from above as though fully set forth herein.

209.     Category 4 Plaintiffs are citizens of the United States.

210.     At all times relevant hereto, FSI was a government actor and a person acting under the color of law. That is, FSI has taken decisive employment actions that have caused Category 4 Plaintiffs harm that is so impregnated with governmental character that it can be regarded as

45

government action. The government is/was driving FSI action whether through incentive or threat.

211.    FSI is also acting under color of law as they have conspired with Government officials to leverage Category 4 Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to unlawfully acquire said Plaintiffs' personal, genetic information.

212.    FSI and the U.S. Government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, FSI has acted in concert with the federal government at the expense of their employees including Plaintiffs.

213.    First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

214.    Article I, Section 23 of the Constitution of the State of Florida provides heightened privacy protections; greater than those provided in the Constitution of the United States.

215.    Applied here, Category 4 Plaintiffs' fundamental right to privacy includes a reasonable expectation to be free from coercion or to be put in a state of undue influence and subjected to battery by FSI by injection of an unwanted, experimental, VBGT into their body as a condition of employment.

216.    This privacy right also includes Category 4 Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control

the extent to which their medical information is shared and released. As a means of coercion, FSI violated Category 4 Plaintiffs' privacy rights when they broadcast their private information in memos, and published said Plaintiffs' PHI by forcing them to wear symbols in the form of medically useless face masks.

217.    Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the
>
> privileges or immunities of citizens of the United States; nor shall
>
> any state deprive any person of life, liberty, or property, without
>
> due process of law, nor deny to any person within its jurisdiction
>
> the equal protection of the laws."

218.    FSI knowingly and willfully discriminated against Category 4 Plaintiffs who expressed religious concerns and treated persons who were vaccinated differently without lawful justification.

219.    FSI, by stating they would allow similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more than the unvaccinated Category 4 Plaintiffs, and to have greater privileges/schedules, and not be required to wear political symbols, did engage in a facial deprivation of equal protection.

220.    While the vaccine mandate appeared neutral on its face, in practice it denies Category 4 Plaintiffs equal protection under the law.

221.    Mandated VBGT's, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted by FSI's conduct.

222.     Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

223.     Category 4 Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is a substantive component of due process and is generally required for medical treatment.

224.     The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes FSI as State Actors from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

225.     Here, Defendants actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, FSI lacks a compelling state interest to impose a VBGT mandate because the VBGT's produce negative sum outcomes.

226.     Assuming the VBGT's could be said to satisfy the interest of preserving public health, FSI's mandate is not so narrowly tailored since it is not the least restrictive means.  There are less numerous, less restrictive means which adequately serve thst public interest of protecting public health against COVID-19. For instance, it is evident that antibodies acquired through prior infection provide protection, and as stated throughout this Complaint, and that natural immunity has shown to provide superior protection than the COVID-19 vaccines. Service to the public

48

interest can be accomplished through safer, less restrictive treatments, preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc, and Ivermectin, thus FSI's conduct fails the strict scrutiny test.

227.    As a direct and proximate result of FSI's policies, practices, regulations and conduct, Category 4 Plaintiffs have suffered harm.

228.    The conduct of FSI as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

229.    FSI is liable to Category 4 Plaintiffs for punitive damages because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- **COUNT IX** ---

**Infliction of Emotional Distress (intentional or in the alternative negligent)**

230.    **Count IX pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

231.    Plaintiffs specifically reallege and incorporate paragraphs 1-60, 68-69, 82, 83-85, 173-175 and 178-206 from above as though fully set forth herein.

232.    FSI acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

233.    FSI conduct has been and continues to be extreme and outrageous.

234.     As a proximate result of FSI's actions, Category 4 Plaintiffs have suffered severe emotional distress.

235.     The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

236.     Category 4 Plaintiffs allege that FSI acted willfully and intentionally and maliciously and in reckless and/or wanton disregard of the interests of said Plaintiffs with respect to the conduct set forth in this Second Amended Complaint.  However, if upon proof it is determined such conduct does not to rise to such intentional level, said Plaintiffs plead, in the alternative, that said infliction of emotional distress is negligent.

237.     As a proximate result of FSI's conduct, Category 4 Plaintiffs have suffered serious and/or severe emotional distress.

238.     The harm caused by FSI was a reasonably foreseeable consequence of FSI's conduct.

239.     FSI is liable to Category 4 Plaintiffs for punitive damages if found to have acted with intent, not mere negligence, because the acts herein described constitute actual malice and oppression and because FSI deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Category 4 Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the said Plaintiffs not limited to but including emotional and mental harm as well as physical harm from the symptoms related to their distress (headache, tremors, anxiety, heart palpitation, depression, nausea, weight loss, hair loss, dizziness, insomnia, etc.).

**---- COUNT X ----**

**Negligence**

240.    **Count X pertains only to Plaintiffs Category 4 - All FSI plaintiffs (listed on Paragraph 15) vs FSI.**

241.    Category 4 Plaintiffs specifically reallege and incorporate paragraphs 1-41, 53-60, 68-69, 82, and 173-175 from above as though fully set forth herein.

242.    FSI owes a duty of reasonable care during the course of operating their business.

243.    This duty includes protecting the Category 4 Plaintiffs' PHI via appropriate means and procedures.

244.    FSI breached their duty of care when by publishing the Category 4 Plaintiffs' PHI throughout the company and by forcing said Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

245.    FSI's negligence was in violation of state and federal laws designed to protect Category 4 Plaintiffs against the type of harm caused by the FSI conduct.

246.    As a proximate cause of FSI's negligence, Category 4 Plaintiffs have suffered injury.

**---- COUNT XI ----**

**Violation of 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III), 21 CFR 50.25**

247.    **Count XI pertains to all Plaintiffs and all Defendants.**

248.    Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

249.    Plaintiffs allege Defendants willfully or negligently violated established federal law under 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III) when they mandated one hundred percent of their employees to receive Emergency Use Authorized (EUA) experimental unapproved medical

products, EUA PCR testing, and EUA mask wearing. Defendants further violated the law when they administered and enforced consequences on those who refused to comply with the mandate for religious or other reasons. All the foregoing counts and injuries sustained by plaintiffs are a product of the total and egregious violation of this core EUA law violation.  Even though Defendants' mandates were instituted during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: "even in a pandemic, the Constitution cannot be put away and forgotten." <u>Roman Catholic Diocese of Brooklyn v. Cuomo</u>, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

250.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression, and Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs.

251.    Specifically, this count is grounded in Defendants' willful, wanton, and blatant disregard of the core law on EUA's – 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) – requirement to be informed of the "*option to accept or refuse* administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (Emphasis added).

252.    In addition, the 2005 Federal Register established the precedent regarding the "*option to accept or refuse administration of AVA; of the consequences*, if any, of refusing administration of the product; and of the alternatives to AVA that are available, and of their benefits and risks." <u>See</u> <u>https://www.federalregister.gov/documents/2005/02/02/05-2028/authorization-of</u> <u>emergency-use-of-anthrax-vaccine-absorbed-for-prevention-of-inhalation-anthrax-by#</u>. (Emphasis added). There is a private right of action to challenge the illegal mandate

of an investigational unapproved medical product. See Doe v. Rumsfeld, Civil Action No. 03-707 (EGS) (D.D.C. Apr. 6, 2005).

253.    The context of the EUA law and AVA precedent language originates from 21 CFR 50.25, Protection of Human Subjects and Elements of informed consent. That federal regulation explains that "*participation is voluntary*, that refusal to participate will involve *no penalty or loss of benefits* to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled." It also references "[t]he *consequences* of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject" in a manner making clear any such "consequences" are strictly medical in nature. See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=50.25.

254.    Defendants used deception, discrimination, psychological manipulation, and physical isolation to force Plaintiffs, under threat of termination, to participate in a dangerous social and medical experiment violative of established EUA law. Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the experimental unapproved medical product without any information on the potential risks or benefits. Several Plaintiffs (and other of Defendants' employees) have suffered adverse side-effects and harm as a result of submitting to the experimental unapproved medical product. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

255.    Defendants have made Plaintiffs second-class citizens within the company and targeted them in a campaign of harassment designed to force plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy. Defendants' experimental unapproved medical product mandate was illegally constituted, lacked a learned intermediary, and

it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never needed to make; take an experimental unapproved EUA medical product or potentially lose their livelihoods and the means by which they provide for their families.

256.    The 21 USC 360bbb-3(e)(1)(a)(ii)(III) law is clear. The precedent in 2005 from the Federal Register for the first ever EUA applied to anthrax vaccine supports this and is also clear. The context of "consequences" from 21 CFR 50.25 supports it. No one can mandate investigational unapproved EUA medical products. This suit is brought to redress the harms Defendants have dispassionately and illegally brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved forever.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, The Atlas Plaintiffs pray for judgment against Defendant Atlas as follows:

(i)     An award of compensatory damages in appropriate amounts to be established at trial;

(ii)    Punitive damages in a maximum amount as permitted by law and as determined by the jury;

(iii)   Awards of damages tailored to make vaccine-injured plaintiffs whole with regard to their manifest and likely future long-term injuries and disabilities;

(iv)    An award of attorneys' fees and costs associated with this action;

(v)     And such other and further relief as the court deems just and proper.

AND WHEREFORE, The FSI Plaintiffs pray for judgment against Defendant FSI as follows:

(i)     An award of compensatory damages in appropriate amounts to be established at

        trial;

(ii)    Punitive damages in a maximum amount as permitted by law and as determined

        by the jury;

(iii)   An award of attorneys' fees and costs associated with this action;

(iv)    And such other and further relief as the court deems just and proper.

Dated: October 11, 2023.

Respectfully submitted,


**John Pierce Law P.C.**

By:            _/s/ John Pierce_
John M. Pierce, Esq.
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com